IsGRIG *v.* SRYGLEY.

4-7962                          197 S. W. 2d 39

Opinion delivered November 4, 1946.

*John M. Lofton, Jr.,* and *Grover T. Owens*, for appellant.

*Baucum Fulkerson* and *Rose, Dobyns, Meek & House,* for appellee.

GRIFFIN SMITH, Chief Justice. Rules relating to activities of Little Rock High School students who organized fraternities and sororities were adopted September 7, 1945. Adults, acting for members of these organizations, and because of their own interest in the subject, sought a restraining order. From the court's action in dismissing the complaint for want of equity this appeal has been prosecuted.

The regulations complained of make enrollees or participants in the groups ineligible to take part in certain activities or to receive designated honors, as shown in the footnote.[1]

---

[1] Quoting: "The policy of the Little Rock School Board relating to 'Rules and Regulations Pertaining to Fraternities, Sororities, and other Secret Clubs in the Little Rock High School' . . . makes pupils who are associated with or who are members of secret organizations ineligible to receive the following offices or honors:

Primarily it is insisted that the board abused its discretion; but, in addition, it is sought to reverse the decree because (a) when Acts 171 of 1929 and 169 of 1931 are read together, there is disclosed an intent to permit activities the board complains of; (b) the rule is in contravention of the First and Fourteenth Amendments to the Federal Constitution:

Dissatisfaction of school management with the groups it was sought to curb—hereafter referred to as Societies—followed physical injuries sustained by Junior College students who were being initiated more than ten years ago. The feeling appears to have been general that orderly procedure had given way to what might be termed unintentional acts of violence, and that the program with its unpleasant incidents would, if unchecked, build a barrier between young people, to the detriment of a very large majority.

In an effort to discharge official duties without being unduly harsh, the board, in 1935, adopted a resolution that those who subsequently joined the organizations, "or who, being already a member, . . . [participate] in the initiation of any new member," were ineligible to hold class office or to receive scholastic or class honors. It was resolved that " . . . commencing with the fall term of 1935, every student in the Senior High School and Junior College [will] be required to sign a written pledge to abide by the rule."

This status continued for two years. Evidence disclosed (Mrs. W. P. McDermott testifying as a director): " . . . An issue of the 'Tiger' came out, setting forth that compelling the pupils to sign this statement that they were not fraternity or sorority members was

---

(1) *Home Room.* (a) Officers. (b) Honorary positions ('Tiger' salesmen, ticket salesmen, etc.) (c) Membership in the Student Council, Girls' Council. (d) Membership on any committees. (e) Any social or political representative office. (2) *Inter-School Sports*: Football, basketball, track and any athletic contests which are scheduled after school. (3) *Band, Choral Groups, Glee Club.* (4) *Committee Appointments From the Student Council, Girls' Council, Athletic Council.* (5) *Any Office in the Student Body Association.* (6) *Scholastic Honors*: Honor Roll, National Honor Society, etc. (7) *Class Honors*: Tiger Editorial Staff, Banquet Toastmaster, etc. (8) *Miscellaneous*: The policy includes all honors given by the faculty or by the student body."

simply putting them in a position which would make them deceptive in their actions. [Two of the students] were very earnest in their presentation of the matter. They felt that we should rescind [the rule] in order to maintain a certain amount of integrity in the whole group; that many of them were signing the cards saying that they were not members when they were."

September 28, 1937, the board revoked the resolution of 1935. It is interesting, however, to observe the reasons for abandonment of the plan after two years of trial and many infractions. After mentioning that the resolution of 1935 was adopted because injuries had been sustained by " . . . several Little Rock Junior College students in a secret fraternity initiation," this statement appears: "[We have become convinced, through experience] that, because of lack of cooperation on the part of the parents, [the rule] is not being observed. Secret fraternities and sororities of students of the Senior High School continue to flourish, and the written statement required of every student . . . is being regarded by great numbers, not as a solemn pledge to be kept, but as a trivial promise to be broken." Net result of the resolution of 1937 was to abrogate the regulation promulgated in 1935, with this subjoined explanation: "We have, therefore, concluded to abolish the rule requiring the signing of the pledge cards and to return to our former position—which is, that when the student leaves the school grounds our responsibility ends."

In the litigation before us we are not required to demarcate a school board's duties and responsibilities in matters requiring discretion; nor could the General Assembly, without running the risk of possible hardships, injury, or extravagance, chart the limits in all cases, and define them. Something—and that *something* has fundamental substance—must be left to the judgment of board members; and this can be done only through the process of delegated power.

Appellees' brief asserts that the undisputed testimony shows that sorority and fraternity members con-

tinued to wear their insignia in open defiance of the authorities, and " . . . they forced pledges to wear bizarre clothing, shaved the heads of boy pledges, and made girl pledges wear their hair in pigtails. They continued to band together in elections, to congregate at the front door, forcing the 'barbarians' to use other entrances, and to reserve certain tables in the cafeteria for [fraternal] members. They remained so absorbed in fraternalism that scholarship slumped. In the language of the listed objections, they were undemocratic; they were snobbish. They carried petty politics into the school, set false standards, fostered habits of extravagance, and their [school work] was made secondary."

It is immaterial whether, as appellees insist, certain parts of the testimony were undisputed, or merely preponderated in favor of the decree, unless some rule of law is infringed.

*First.*—The board's action does not transgress Amendment No. 1 to the Federal Constitution. The amendment restrains Congress (a) from making laws respecting an establishment of religion or prohibiting the free exercise thereof; (b) abridging the freedom of speech, or of the press; (c) [preventing] the people peaceably to assemble and to petition the government for a redress of grievances.[2] Appellants have not seriously argued the constitutional provisions mentioned and we shall not discuss them because they do not apply; nor is due process of law, as contemplated by the Fourteenth Amendment, involved.

*Second.*—Act 171 of 1929 was intended, as the title says, to prohibit undemocratic practices in public schools. A public school fraternity, sorority, or other secret society, is defined to be any which seeks to perpetuate itself by taking in additional members on the basis of a vote of the society " . . . rather than upon the free choice of any pupil in the school who is qualified by the rules of the school to fill the special aims of the organization or society."

---

[2] See Arkansas Constitution of 1874, Art. II, §§ 4 and 6.

Section three of the act imposes upon school directors and boards of education the duty of expelling those who violate the law. It details the things that are prohibited.

Section four applies to any persons *not enrolled* in the school, directing that they refrain from soliciting members for such organizations; nor may such outsiders attend a meeting of a banned society.

Section six is: "The provisions of this act shall not apply to fraternities, sororities, or secret societies of the University of Arkansas, any State Teachers' College, or other State supported institutions of Junior College rank, or rank above Junior Colleges, or Senior High School Students of National Fraternities or Societies, nor to students of these institutions in their relation to such societies or organizations in these institutions; nor shall the provisions of this act apply to any non-secret society or organization authorized and sponsored by the public school authorities."

The answer to appellants' contention that they are protected by Act 171 is that it does not *authorize* existence of the societies, but (Sec. 6) merely exempts them from penalties otherwise provided; nor has the school board sought to compel the membership to disband. All it has done relates to discipline, deportment, and scholarship honors. This end is achieved by withholding recognition and privileges that accompany conduct conformable to reasonable rules.

Act 169 of 1931 and Act 184 of 1935 were attempts by the General Assembly to bring under a common heading the miscellaneous school laws from time to time enacted, many of which were obsolete, some being in conflict with others. The 1931 measure as printed in the official Acts (exclusive of index) contains 104 pages. Section 97(m) charges directors with the duty of doing " . . . all things necessary and lawful for the conduct of an efficient, free public school or schools."

The genius of our free school system is that it is alike available to rich and poor. Its beneficence may

influence the under-privileged child who happens to reside "across the tracks," or inure to the democratic deportment of those upon the Heights.

A number of interesting cases are cited in *Wilson et al. v. Abilene Independent School District, et al.*, decided October 26, 1945, by the Court of Civil Appeals of Texas, Eastland District. Headnote No. 9, 190 S. W. 2d .06, is: "Order of school board requiring all junior and senior high school students to sign pledge cards pledging that they are not and will not become a member of any fraternity, sorority or secret organization, not approved by principal, as a prerequisite to becoming eligible to participate in extracurricular activities is authorized by constitutional provision relating to support and maintenance of an 'efficient' system of public free schools, and is not violative of any other constitutional provision."

Essentials of the Arkansas and Texas constitutions relating to this subject are printed in parallel columns:

| TEXAS | ARKANSAS |
|---|---|
| "A general diffusion of knowledge being essential to a preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." | "Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free schools whereby all persons in the State between the ages of 6 and 21 years may receive gratuitous instruction." |

In *Dickinson, State Auditor* v. *Edmondson*, 120 Ark. 80, 178 S. W. 930, Ann. Cas. 1917C, 913, it was held that under our Constitution (Art. XIV, § 1, copied above) no appropriation of funds for maintenance of the common schools was necessary; but that the General Assembly had the power, in respect of high schools, to authorize use of common school money. It will be observed that in the Texas and Arkansas constitutions similar words are used. In Texas the mandate is that the Legislature shall make provision for support and maintenance of *"an efficient"* system. In Arkansas it is directed that the State

maintain "*a general, suitable, and efficient system.*" The word "*efficient*" appears in each document. The term is emphasized by Mr. Justice GRAY who spoke for the Texas Court of Civil Appeals in the Abilene decision, who effectively conveyed the thought that a system could not be efficient if essential rules were being violated, if time apportionable to study was being utilized for social purposes, and if disinclination of a particular group to associate with others occasioned discord and brought on dissatisfaction.

*Antell* v. *Stokes*, (1934) 287 Mass. 103, 191 N. E. 407, is annotated in 134 A. L. R., p. 1274. The second headnote in the North Eastern Reporter is: "Rule of school committee prohibiting solicitation and initiation of high school pupils to unapproved secret student organizations, on penalty of expulsion from school, and requiring officers of such organizations to file certain information concerning them, *held* within authority of school committee." A supplemental annotation in 134 A. L. R. mentions the fact that the rule it announced in Vol. 27, p. 1074, had been sustained by the Massachusetts case. See, also, 24 R. C. L., p. 629, § 86, where it is said:

"In the absence of statute on the subject, regulations of school authorities prohibting the connection of students with Greek letter fraternities or denying certain privileges to such members have been uniformly upheld as proper disciplinary regulations." To the same end is the summary found at page 855 of Corpus Juris, Vol. 56. Contrary, *W. R. Wright, et al.* v. *Board of Education*, 295 Mo. 466, 246 S. W. 43, 27 A. L. R. 1061.

Whatever term may be used to illustrate the clash of will between teachers and pupils—whether insubordination, disregard of precept, or a failure to realize the importance of what was being done—it is without dispute that in 1937 representatives of groups similar to those with which we are now dealing met with school authorities and admitted that many of the young people were deceiving the men and women who were employed by taxpayers to transmit to them such educational facilities as the district afforded. Effect of the rep-

resentations was, "Whether you like it or not, we are going ahead with our societies. You may coerce us into signing the pledges, but you can't make us keep our promises."

A situation of this kind was not contemplated by those who provided a free school system. Some one, at some point, must hold a responsible hand; and some one must say to our maturing citizens that barter by threat is not an approved method of procuring results. This is particularly true when the thing sought to be approved has been put to the student body and emphatically voted down, as fraternities and societies were just before the resolution of 1945 was adopted.

Conceding, as anyone who reasons must, that group organizations may promote efficiency, and in some instances inculcate a sense of responsibility in young men and young women who have reached in life's span a period of juvenile dependability, it does not follow that school directors are without authority to impose reasonable restrictions in those instances where experience, observation, and a knowledge of the personality being dealt with suggest this course.

Affirmed.