Argued January 23, affirmed July 3, 1952

# BURKITT ET AL. *v.* SCHOOL DISTRICT NO. 1 ET AL.
## KEYSER ET AL., INTERVENERS-RESPONDENTS

246 P. 2d 566

472

*C. O. Fenlason* and *Paul A. Sayre,* of Portland, argued the cause for appellants. With them on the briefs were A. I. Bernstein, Arthur D. Platt, Bert S. Gooding, Earl A. Fewless, and Robert L. Myers, of Portland.

*Grant T. Anderson* argued the cause for respondents and *Clarence J. Young for interveners-respondents.* With them on the brief were King, Wood, Miller, Anderson & Nash, of Portland, and Koerner, Young, McColloch & Dezendorf, of Portland.

Before BRAND, Chief Justice, and HAY, ROSSMAN and LUSK, Justices.

LUSK, J.

Since 1909 secret societies in the high schools of this state have been prohibited by law. The statute in OCLA so providing reads:

§ 111-3004. ''Secret societies of every kind and

character, including fraternities and sororities, so called, which may now or hereafter exist among the pupils of any of the public schools of this state, including high schools, either local or county, are hereby declared unlawful.''

§ 111-3005. ''It is hereby made the duty of each school board within the state, to examine, from time to time, into the condition of all schools under its charge and to suppress all secret societies therein, and for this purpose such boards are hereby authorized to suspend or expel from school, in their discretion, all pupils who engage in the organization or maintenance of such societies.''

§ 111-3006. ''This act shall not apply to either the state agricultural college or the state university.''

These provisions were originally enacted as Ch 215, General Laws of Oregon 1909.

In the high schools of the city of Portland, which embraces School District No. 1, Multnomah County, Oregon, up until the time of the action of the school board of that district which brought on the present litigation, the statute appears to have been more honored in the breach than the observance. Until 1936 the school authorities seem to have done little if anything to discharge their statutory duty to ''suppress all secret societies'' in the high schools, although there were for many years in the high schools of Portland a number of secret fraternities and sororities, some of the former being local chapters of national organizations. In 1936 a pledge system was inaugurated under which pupils and their parents were required to sign a pledge that the pupil was not and would not become a member of any such society. If it was discovered that a pupil had violated the pledge he was suspended; afterward he and a parent could come to the superintendent's office and agree that the pupil would resign

from the organization, whereupon the suspension would be lifted. The system was found only partially effective. Sometimes, when the issue arose, parents protested that the particular organization involved was not a secret society and that it was not operating in the schools. In 1943 and 1944 the school authorities, because of these protests from parents and their own feeling of uncertainty as to how far they could go in the enforcement of the law, abandoned the pledge system, and adopted a policy of ignoring the societies as long as they kept their activities out of the schools. This did not work either; the pupils then began to wear fraternity and sorority pins openly and to engage in pledging, "dogging," and other activities peculiar to their organizations, in the schools.

It was against this background of experience with a problem which, as Mr. Jonathan W. Edwards, deputy superintendent of schools testified, "has existed in our schools for the last 35 or 40 years," and with the purpose of discharging the duty imposed upon them by law, that the board of directors of the school district on or about October 27, 1949, adopted a resolution by which were promulgated certain regulations prescribing the conditions under which clubs could be organized and conducted in the high schools of the district. The complete text of the resolution, with certain amendments adopted after October 27, 1949, is attached to this opinion as an appendix.

The resolution contains the following recitals:

"WHEREAS, secret societies of every kind and character, including fraternities and sororities, so called, are contrary to state law, and

"WHEREAS, the state law imposes upon the School Board the duty of suppressing such organizations within the public schools of this district

and to that end authorizes the School Board to suspend or expel from schools in its discretion all pupils who engage in the organization or maintenance of such societies, and

"WHEREAS, clubs and organizations other than secret societies, organized and maintained by school pupils can become and be inimical to the best interests of the school pupils, the community, or the effective operation of the schools".

The superintendent of schools is then directed to suppress secret societies "and also clubs and organizations other than secret societies which the Superintendent in his discretion considers inimical to the best interest of the school pupils, the community, or the effective operation of the schools, by suspending or expelling" pupils who are members thereof. It was further resolved that school clubs should not be banned which have been approved and chartered by the high school principal on conditions established by the superintendent of schools. These provisions are followed by what are termed "tentative conditions," which provide that all organizations of pupils must be approved by the central school administration and chartered by the particular school from which organized; that the application for a charter must show the sponsoring group, adult supervisor or advisers, the purposes of the organization and standards for membership, a list of officers and members, a copy of any ceremonial or initiation, and a pledge against secrecy. Then follow 18 rules designed to keep the school authorities advised of the membership and financial condition, and to regulate the activities of these chartered organizations. It is required that at all functions of the organizations adult advisers approved by the school principal shall be present; any initiation ceremonies not approved by the principal are prohibited, and such

ceremonies are required to be open to the school staff and parents of inductees; no more than a two-thirds vote shall be required for admission to membership; hazing, "dogging" and all other types of preinitiation activities, rush periods, and post-bid screening of members are prohibited. Membership in an organization not chartered is made a ground for suspension or expulsion.

The particular rule, however, which is involved in this case is No. 7, which reads as follows:

"Members of any chartered organizations shall be regularly enrolled high school students from one high school student body. Graduates or students who have dropped from school shall not be permitted to retain membership. Public school students who were bona fide members of an inter-school club prior to October 27, 1949, may retain membership in any such club that qualifies for a charter."

The validity of this rule is the principal question in the case. There is also a subordinate question concerning discretion in the enforcement of this rule vested in the Superintendent of Schools.

Plaintiffs are three adults and four minors. Of the adults one has a son and a daughter attending Lincoln High School, a public school of the district; another has a daughter attending St. Helen's Hall, a private school in Portland; and another has two daughters attending St. Mary's Academy in Portland, erroneously referred to in the record as a parochial school, actually a private school under Catholic auspices. The two private schools give a high school education. Each of the children of the adult plaintiffs is a member of one or another of the four organizations named in the complaint whose status is here involved. Plaintiffs refer to these organizations as "unincorporated

clubs," defendants and interveners as sororities and fraternities. We shall call them simply "clubs." Each of the minor plaintiffs is a pupil of a Portland public high school and a member and officer or representative of one or another of the following named clubs: Alpha Sigma, Joma Joma, Wiki and Pierrette, and they appear on behalf, not only of themselves, but of the clubs named and all other clubs similarly situated. The defendants are the school district, its board of directors, and school clerk. Uniting with the defendants are the interveners, who are the parents of children who are either now or shortly will be attending high schools of the district.

The suit was brought to enjoin enforcement of the "tentative conditions". Prior to hearing on the merits a temporary restraining order pending the trial was entered. The trial lasted nearly two weeks, and there are nearly a thousand pages of testimony. The court took the case under advisement, and thereafter rendered and filed an opinion in writing adverse to the plaintiffs' contentions. A decree of dismissal was entered from which the plaintiffs appealed.

The record shows that for some time before the adoption of the resolution the school board had been exploring the problem of secret societies and that the parents of some of the children who were members of the plaintiff clubs met with the school authorities for the purpose, if possible, of reaching a common ground as to the extent of the restrictions to be imposed. It is unnecessary to relate the details of these negotiations. It is enough to say that the school board did not act hastily or without due deliberation and careful consideration, and that ultimately the plaintiffs offered, in their pleadings in this case, to adopt constitutions for the clubs which would in effect con-

stitute a compliance with all the "tentative conditions" except Rule 7, an offer which the defendants declined to accept.

The purpose of Rule 7 is to confine membership in any club to pupils attending a particular high school. It forbids interschool clubs, making an exception, however, in favor of students who were bona fide members of an interschool club prior to the time of the adoption of the resolution of October 27, 1949.

The basis of the attack on Rule 7, as set forth in the complaint, is that the plaintiff clubs are not and never have been secret societies, and none of the minor plaintiffs has ever been a member of a secret society; that the activities of the clubs are carried on entirely outside the schools, and enforcement of the rule would constitute an invasion of parental authority; that the rule is arbitrary and discriminatory, and violates the right of assemblage guaranteed by Art I, § 26, of the constitution of Oregon.

The defendants and interveners rely not only on the statute banning secret societies, but also on the school board's statutory power to make rules and regulations. Section 111-1020, OCLA, provided:

> " * * * The board may establish such rules and regulations for the government of teachers and pupils as are consistent with those of the state board of education, as the interests of the school require."

This section was repealed by Ch 588, Oregon Laws 1951, but § 3 of that chapter substantially reenacted the provision above quoted. Section 111-1222 prescribes the duties and powers of district school boards in districts of the first class, such as School District No. 1, Multnomah County, and Subdivision 3 confers author-

ity "To make rules and regulations for the government of the district." Subdivision 3 has not been changed by subsequent amendments. See Oregon Laws 1941, Ch 48, and Oregon Laws 1949, Ch 37.

Plaintiffs make no attack on the constitutionality of the anti-secret society statute. As far as the federal constitution is concerned, the validity of such state legislation has been authoritatively determined by *Waugh v. Board of Trustees,* 237 US 589, 35 S Ct 720, 59 L ed 1131 (1915). Other cases sustaining such statutes against claims of violation of constitutional rights, both federal and state, are *Bradford v. Board of Education,* 18 Cal App 19, 121 P 929; *Lee v. Hoffman,* 182 Ia 1216, 166 NW 565; *Satan Fraternity v. Board of Public Instruction,* 156 Fla 222, 22 So2d 892; *Sutton v. Board of Education,* 306 Ill 507, 138 NE 131; *Isgrig v. Srygley,* 210 Ark 580, 197 SW2d 39; *Steele v. Sexton,* 253 Mich 32, 234 NW 436. In *Bradford v. Board of Education,* supra, the court said:

> "The first Greek letter society in a secondary school was Alpha Phi, a literary society, which became a part of a fraternity in 1876. Subsequently secret societies, patterned after college and university fraternities, sprang into existence in the high schools all over the country, until now they have 'become so numerous,' says a writer on the subject, 'as to make it necessary to manipulate the Greek alphabet in an artful way in order to make the necessary distinctions.' In time many educators came to believe that whatever good might be claimed for college fraternities was not shared by secret fraternities organized among boys and girls attending the preparatory schools whose characters are yet unformed. It has been said of such societies that they tend to engender an undemocratic spirit of caste, to promote cliques and to foster a contempt for school authority. Doubtless these organi-

zations have many redeeming features, and, we may say, the standard of excellence of some of them is such that they are not opposed by school authorities. (Report of Commissioner of Education, Annual Reports, 1907, of Interior Department, vol. 1, pp. 437, 441; Encyclopedia Brittannica, 11th ed., vol. XI, p. 40.) Nevertheless, in order to curb what is said to be their evil effects in secondary schools, rules and regulations have recently been adopted by boards of education in many of the cities of the country; laws have also been enacted in Ohio, Indiana, Minnesota, Kansas and other states, either absolutely forbidding them or placing them under control. Cases arising under these laws and local regulations have come before the courts of those states, and such courts have uniformly held valid reasonable rules adopted by school authorities to prevent the establishment and development of these secret societies in preparatory schools'' (citing authorities).

We may observe at this point that the evidence in the instant case fully supports the opinions of educators referred to by the California court concerning the harmful tendencies of secret societies in the secondary schools. It is not necessary to labor that point since it must be presumed, from the enactment of a valid statute declaring such societies illegal, that they are the source of evils which need to be eradicated. The plaintiffs do not assert anything to the contrary.

■■ The parties differ upon the construction of the statute, the defendants and interveners contending that it condemns not only secret societies, but fraternities and sororities even though they are not secret. By the terms of the statute ''Secret societies of every kind and character, including fraternities and sororities, so called,'' are declared unlawful in the high schools of the state. We cannot accept the broad interpreta-

tion suggested. Not only does it call for a forced construction, but it would render the statute of doubtful constitutionality as in violation of Art IV, § 20, Oregon constitution, which reads in part: "Every act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title." The title of the act reads:

> "To abolish and prohibit secret societies in the public schools of the State, authorizing school authorities to suppress them and for this purpose to suspend or expel students, and excepting the State Agricultural College and the State University from operation of the law."

The subject expressed in the title is "secret societies," and it is a highly debatable question whether nonsecret fraternities and sororities could be held to be included in the subject so expressed. Moreover, § 2 of the act (§ 111-3005, OCLA) makes it the duty of school boards to suppress all "secret societies" without mentioning fraternities or sororities. We think that the statute recognizes the fact that a society may be a fraternity or sorority and still not be secret, and that it aims at only such fraternities and societies as are secret. Of course, it is a well known fact, and the legislature, it must be presumed, was aware of it, that secrecy of some sort is a usual characteristic of college fraternities and sororities which have set the pattern for such organizations in the high schools of the country. In the article on college fraternities in the Encyclopaedia Britannica (11th ed) (1910) it is said: "They are nominally secret, with one exception (Delta Upsilon)." It is further said: "Of late years, numerous societies bearing Greek names and imitating the externals of the college fraternities have sprung up in the high schools and academies of the country, but have excited

the earnest and apparently united opposition of the authorities of such schools." In the article on the same subject in 13 Enclycopedia Americana 401 it is stated: "While these societies are secret in character there is seldom any over-emphasis of ritual or mystery in their conduct, the protection of meetings, constitution and mottoes and the inviolability of the society's building or 'hall,' being all the secrecy involved." Thus, while we are of the opinion that the statute does not comprehend nonsecret societies, we think that there need not be any high degree "of ritual or mystery" in their conduct to bring a particular society within the category of "secret." Such things as a pledge or an oath not to reveal the secrets of the society, a secret password or grip, rituals, including initiation ceremonies, which members are under an obligation not to disclose—any or all of these are enough. However, plaintiffs alleged that Alpha Sigma, one of the clubs named in the complaint, "has never had, does not now have and will not have any secret oath, ritual, meetings or other activities," and that this is true of the other named clubs. Further, they alleged that "there are many other clubs similarly situated, some with minor female membership and some with minor male membership."

The evidence shows that the four named clubs are each represented in an organization called "the Interfraternity Council of Portland" and commonly referred to as the "Big Six." The constitution of the Interfraternity Council provides in § II: "The purpose of said Council is to promote good will among the Fraternities and Sororities of said organization", and in § III: "Council representatives shall consist of the standing members of the following organizations: Sororities—Alpha Sigma, Cleophas, Joma Joma, Pier-

rette, Thea, Wiki. Fraternities—Alpha Omega Rho, Alpha Sigma Lambda, Phi Chi, Psi Kappa Nu, Sigma Phi Upsilon, Theta Chi Omega." Inasmuch as, apparently, all high school organizations except most of the members of the Big Six had obtained charters and were complying fully with the rules established by the school board, it is a fair inference that members of the Big Six, other than the clubs named in the complaint, are "the other clubs similarly situated."

This inference is supported by the testimony of Kenneth Leach, president of the Big Six and a member of Phi Kappa Nu, who was called as a witness by the defendants and testified that the dean of girls at Grant High School, Miss Mary Parounagian, had asked him to give her the names of the members of Phi Kappa Nu, and that he told her that he was unable to disclose the names and referred her to Mr. Fenlason or Mr. Sayre, two of the plaintiffs' attorneys. He further informed Miss Parounagian, in substance, that under the advice of Mr. Fenlason he was not giving out any information about the clubs at that time. In addition, the minutes of meetings of the Big Six show that Mr. Fenlason appeared before that organization and gave them information and advice with reference to the controversy with the school administration and to this law suit.

The plaintiffs do not deny that there are secret societies in the Portland high schools, or at least that there were on February 28, 1950, the day their complaint was filed. They impliedly concede the existence of such societies by alleging in their complaint that there were then, and theretofore had been, a substantial number of clubs, fraternities and sororities in the high schools, and that "relatively few of such organizations had any incidents of secrecy or engaged

in or permitted either the use of physical abuse upon any person or any other illegal, immodest or unbecoming conduct.'' And we learn from the circuit judge's opinion that, in a brief filed in the court below, counsel for plaintiffs said, ''We do not assert to this court that among all the clubs there were none which might not be classified as secret.'' Commenting upon this the circuit judge said in his opinion: ''The evidence shows that there are some two hundred eighty so-called clubs, or societies, sororities or fraternities in the high schools in Portland, and certainly it would not be required of the school board or the superintendent of schools to ferret out each and every club and all their proceedings to find out if they were secret societies.'' We concur in this observation.

The circuit judge found in his opinion that at least some of the plaintiff clubs were secret societies. We think there is justification in the evidence for that finding. Moreover, the evidence shows that in organization, officers, types of records kept, rushing, pledging, initiation (with necessary variations as between fraternities and sororities) all the members of the Big Six followed somewhat of a pattern, and that three members of the Big Six were chapters of national fraternities. We are inclined to the opinion that some elements of secrecy were likewise common to all the Big Six societies. Indeed, if the secret societies admitted to exist are not to be found among the unchartered members of the Big Six, we are at a loss to know where to look for them. But in the view we take of the actual question for decision, it is not necessary to determine which clubs are secret societies or whether the plaintiff clubs are among them. Much testimony was adduced upon that subject, and there has been extensive argument respecting it. The basic questions,

however, are whether there is a secret society problem in the high schools of Portland, and, if so, whether, by the adoption of Rule 7, along with the other so-called "tentative conditions," the school board exceeded its authority; or whether, on the other hand, Rule 7 is a reasonable regulation appropriate to accomplish the end expressed in the resolution of October 27, 1949, namely, the suppression of secret societies in the high schools.

The concessions of the plaintiffs and the evidence leave no doubt whatever of the existence of secret societies in the Portland high schools in violation of law, and the evidence establishes the ineffectiveness of previous measures taken to suppress them. We come, therefore, to the question of the reasonableness of the regulation.

Rule 7, it will be recalled, provides in part: "Members of any chartered organizations shall be regularly enrolled high school students from one high school student body." The formulation of this and the other rules was the joint effort of the staff of the superintendent of schools in collaboration with the principals of the various schools. They had the benefit not only of their own experience in dealing with the problem, but, as well, of a large body of material in magazines, books and school publications. It may be remarked in passing that the problem of secret societies in the high schools is by no means a local one, but has a national aspect, so much so that some 25 states have adopted legislation similar to the Oregon 1909 act. The difficulties which high school teachers, principals, superintendents and school boards have encountered in the attempt to enforce such laws, as well as the objectionable features of secret societies which have led

to their enactment, may be found reflected in the school publications referred to in the margin.[1]

The defendants and interveners supported the reasonableness of Rule 7 by the testimony of a large number of witnesses qualified by experience to express informed opinions on the subject. These included Paul A. Rehmus, superintendent of schools; Jonathan W. Edwards, deputy superintendent of schools; five high school principals and vice principals; S. Eugene Allen, a member of the school board; Mrs. Esther Strong, principal of Catlin School, a private school in Portland; and Father Arthur Sullivan, superintendent of Catholic schools in western Oregon. They were agreed that Rule 7 was necessary if the other rules were to be enforced, because membership in a club made up of pupils from different schools gives rise to a difficult administrative problem. In the appraisal of their testimony it should not be forgotten that there are nine high schools in Portland, 14,000 high school pupils, and more than 280 high school clubs. Mr. Harold York, principal of Roosevelt High School, summed up the matter in his testimony by saying "that as a high school principal I don't think it is fair to expect me to accept responsibility for activities and actions of clubs that contain students from other schools."

Excerpts from the testimony of some of the other witnesses as to the reasonableness of Rule 7 will be found illuminating.

### Mr. Edwards

"Members of a single high school under the regulations we have formed can be kept under control more easily, and more accurately than they can

---

[1] The American School Board Journal, August 1947, p. 26; NEA Journal, March 15, 1952, p. 141; The Bulletin of the National Association of Secondary-School Principals, March, 1950, p. 278, May, 1949, pp. 15, 21.

if you have them spread over five or six high schools. The tendency of the organizations to get out from control is increased by the spread that you give it, and the history of this whole thing has been that while an organization may operate for a considerable period of time without any difficult problems arising in that organization, yet we know that time and again one or the other, due to lack of proper supervision, has committed acts that were detrimental to the school and to the society itself. Now, I am not stating that even if it were in one school that wouldn't happen, but you increase it when you increase the number of schools, because we cannot control them as well.''

### Mr. Allen

''There are two major reasons. One of them is—and, as a matter of fact, I think the first one that I will mention is the one that, at least, has as much weight in my opinion as the second reason I will come to. Reason number one was that interschool membership in school organizations is the means by which these school fraternities and sororities achieved an unusually high degree of selectivity, which, in my judgment, in trying to decide about how to vote on this rule, led me to conclude that that led, in turn, to unusual snobbishness, to unusual influence, undue prestige being attached to these particular clubs. I could illustrate that by pointing out to the Court that if an organization is made up of 30 members, and if in the organization five members come from each of six schools, it is readily apparent that that is looked upon as rather a high honor by at least certain of the students in those schools. It becomes unusually selective, and because of that reason it appeared to me that that gave rise to the very evil social consequences that were complained of, and which, as a matter of fact, I was certain existed. Reason number one then is the undue prestige, and influence, far out of proportion to the numbers in the club that attached to interschool membership.

"The second reason was that it is precisely at the point of interschool membership where your control, supervision and regulation of organizations breaks down. As a practical matter we expect the principal to be responsible for affairs in his school, but he cannot exercise, as a practical matter again, jurisdiction over students of other schools, certainly over students of private and parochial schools. And, it is at that point, therefore, that our whole program of supervision, regulation, and control would break down in my judgment."

### Mrs. Esther D. Strong

(She had formerly been dean of students at Mills College in California, dean of girls in Polytechnic High School at Long Beach, and dean in the State College of Lafayette. Three of the plaintiff sororities have Catlin students as members.)

"I will try to tell you what I think about Rule 7. I think it is a very important administrative expediency. In other words, I call it administratively expedient to pass that at the present time. Philosophically I think young people should have a great deal of intellectual and social intercourse between schools, public schools and private or independent, and parochial, but I believe that this kind of intellectual and social intercourse among young people can be worked out for more children in a more satisfactory way through some other medium than through organizations which like the sororities have an overall membership from each school. In other words, purely for administrative expedience for the time I would favor that rule which means the membership in a club must be within the school. But, by the Superintendent's consent I should hope very much that there could be intellectual and social intercourse between chartered groups.

\* \* \* \* \*

"I might add one other thing. When I came to the Catlin School I was new in Portland. If I may say, I had lived through this kind of sorority situa-

tion in the public schools at Long Beach where they were abolished, but as I came to Portland I knew nothing about the situation here, and I had a great sense of frustration in trying to find the center of authority, or the nucleus, or the core of the sorority. I found it very difficult to get information from individual girls who were members. They have a sense of loyalty to their own sorority, and a sense of secrecy about telling anything that occurs in it, and subsequently the information I have received has come from those who have graduated, for the most part, and they have talked with me very freely, and also some who have become inactive, I think, while they are in school. But, as an administrator I have found it difficult to find any center of being to know how to get at the problem which I think goes into the morale of our student body, and that is why I believe for the time being the membership of a club should be within a given school, subject to the control of the principal.''

### *Father Sullivan*

''Several principals of our schools over a period of years have been disturbed by the existence of so-called sororities and fraternities in our own schools. That is, they are concerned about the number of students in our schools who are attending these sororities, not because of the number itself, but because they feel that it creates a problem, and, as a matter of fact I agree with them that it does create an administrative problem. The number attending or belonging to the fraternities and sororities is relatively small, and yet there rises this problem of jurisdiction and the responsibility of a principal in a school. The principal, as I believe we all agree, is the one who is rightfully established and invested with the authority to give a desirable amount of supervision to the activities of students attending that school. When there are student clubs, or sororities, or organizations, composed even of two different public schools there is

a problem created because it is quite obvious that the principal of neither school has complete and direct supervision. * * * It was when I learned sometime back through the press that the public School Board, and the public school administration was contemplating its present action that I felt greatly satisfied because pending the outcome of this action I am sure that the School Board of the Catholic school system will take similar action.''

\* \* \* \* \*

''Q  Do you have any reasons other than those related to the administrative problem to suggest why you believe the rule to be reasonable?

''A  Yes, I would base my reason on the reports of principals of some of our schools, principals who have observed that students who join the so-called sororities and fraternities change in their attitude toward their own school. They reported that it has caused a lessening of school spirit, school loyalty, that even within a particular school itself, because of conflict in their social program, because of their affiliation with this outside group, they find it difficult to carry out some of the school programs and social affairs, and that conflicts arise. Another thing, I think that every American school has a tremendous responsibility, not only to teach democracy in all its theory, but really to put it into practice, and that youngsters who are rejected from the affiliations of a particular group, I think those youngsters are being subjected to experiences that can be very detrimental. After all, they are youngsters, they are only 13 to 16 years old. It is a most impressionable time of their lives, and I think that good school administration would strive to avoid and save the youngsters from such experiences. That is my thinking on the matter.''

■ We turn to a consideration of the principles of law which govern this case. In 47 Am Jur, Schools, 328, § 47, it is said:

"Since the courts will not interfere with the exercise of discretion by school directors in matters confided by law to their judgment, unless there is a clear abuse of discretion or a violation of law, they are usually disinclined to interfere with regulations adopted by school boards, and they will not consider whether the regulations are wise or expedient, but merely whether they are a reasonable exercise of the power and discretion of the board. The reasonableness of regulations is a question of law for the courts. Acting reasonably within the powers conferred, it is the province of the board of education to determine what things are detrimental to the successful management, good order and discipline of the schools and the rules required to produce these conditions. The presumption is always in favor of the reasonableness and propriety of a rule or regulation duly made."

Among the many cases approving and applying the foregoing rules are *Kinzer v. Directors,* 129 Ia 441, 105 NW 686; *Coggins v. Board of Education,* 223 NC 763, 28 SE2d 527; *Hughes v. Caddo Parish School Board,* 57 F Supp 508; *Wayland v. Board of School Directors,* 43 Wash 441, 86 P 642; *Wilson v. Board of Education,* 233 Ill 464, 84 NE 697, 15 LRA (ns) 1136; *Antell v. Stokes,* 287 Mass 103, 191 NE 407; *Wilson v. Abilene Independent School District,* (Tex App) 190 SW2d 406.

██ Especially pertinent is the following statement by the Supreme Court of North Carolina in *Coggins v. Board of Education,* supra:

"Ordinarily, complaints of disaffected pupils of the public schools against rules and regulations promulgated by school boards for the government of the schools raise questions essentially political in nature, and the remedy, if any, is at the ballot box. But the unreasonableness of such a rule is a judicial question, and the courts have the right of review.

They will not hesitate to intervene in proper cases. In doing so, however, it will be kept in mind that the local board is the final authority so long as it acts in good faith and refrains from adopting regulations which are clearly arbitrary or unreasonable. It will be remembered also that respect for constituted authority and obedience thereto is an essential lesson to qualify one for the duties of citizenship and that the school is an appropriate place to teach that lesson.

"If the opinion of court or jury is to be substituted for the judgment and discretion of the board at the will of a disaffected pupil, the government of our schools will be seriously impaired, and the position of school boards in dealing with such cases will be most precarious. The Court, therefore, will not consider whether such rules and regulations are wise or expedient. Nor will it interfere with the exercise of the sound discretion of school trustees in matters confided by law to their discretion."

*Antell v. Stokes,* supra, sustained a regulation for the control and ultimate suppression of secret societies in a high school adopted pursuant to statutory authority to "supervise and control all athletic and other organizations composed of public school pupils and * * * organized in connection therewith." In *Coggins v. Board of Education, Wayland v. Board of School Directors, Wilson v. Board of Education,* and *Wilson v. Abilene Independent School District* (all supra), similar regulations were held valid under the general power of school directors to establish rules and regulations, there being no statute declaring secret societies illegal.

The only decision to which we have been referred or which we have seen, which is apparently in conflict with these authorities, is *Wright v. Board of Education,* 295 Mo 466, 246 SW 43, 27 ALR 1061. It was the view

of the Missouri court that the school board had exceeded its authority in adopting a rule of the kind under consideration. Two members of the court dissented. The decision seems to be opposed to the weight of authority. See the annotation to the case in 27 ALR beginning at p. 1074. Even so, a clear ground of distinction from the case at bar rests upon the fact that Rule 7 and the other rules here in question were adopted in aid of an express statutory direction to suppress secret societies in the public schools. That element was not present in the Wright case, and the distinction was recognized by the Supreme Court of Missouri in its opinion. It is also commented upon in *Antell v. Stokes,* supra.

■ If the board had the power to make the regulation then the power to enforce it by expulsion is implied. *Nicholls v. Mayor,* 297 Mass 65, 7 NE2d 577; *Antell v. Stokes,* supra; *Leoles v. Landers,* 184 Ga 580, 192 SE 218, appeal dismissed for want of a substantial federal question 302 US 656, 82 L ed 507, 58 S Ct 364.

■ In adopting Rule 7 the school board did not exceed its authority. The rule is not unreasonable, arbitrary or discriminatory, and is not vulnerable to any constitutional objection. The power to make the rule is found in the statutes to which we have referred, conferring on the board authority to establish rules and regulations for the government of pupils and of the district, and in the statute which charges school boards with the duty to suppress secret societies. The board could lawfully take all reasonable and proper measures to enable it to comply with that mandate. The record here affords an excellent illustration of the need for rules which would bring under the actual supervision and control of the school authorities the numerous clubs within the high schools; for, notwithstanding the ad-

mitted fact that some of these clubs are secret societies, and, notwithstanding an aura of secrecy that envelops many of the clubs whose doings are reflected in the pages of the transcript and in numerous exhibits, the concrete, tangible evidence of such secrecy that emerged in a trial which lasted nearly two weeks, is meager indeed. It would seem that one of the secrets which members of such societies feel under an obligation to keep inviolate is the very fact of such secrecy.

■ We may take judicial notice of the fact that the secret societies known as fraternities and sororities do not as a rule confine themselves to a single school. Multiple school membership is not perhaps of their essence, but it is certainly one of their normal characteristics. Rule 7, therefore, may well have been considered by the board to be an effective means of ridding the schools of such societies. And certainly the evidence, some of which we have recited, showing the desirability of the rule as an administrative measure, leaves little to be said for the claim that it is either arbitrary or unreasonable. Whether it is wise is another question, with which this court has nothing to do.

In support of the contention that the rule violates parental authority counsel for the plaintiffs cite 47 Am Jur, Schools, 426, § 173, where it is said:

"It has been held that school directors and teachers have no concern with the individual conduct of pupils wholly outside the schoolroom and school grounds when they are presumed to be under the control of their parents. It has been said that when the schoolroom is entered by a pupil, the authority of the parent ceases and that of the teacher begins; when the pupil is sent to his home, the authority of the teacher ends, and that of the parent is resumed. On the other hand, the view

seems well settled that the power of school authorities over pupils does not cease absolutely when they leave the school premises; conduct outside of school hours and school property may subject a pupil to school discipline if it directly affects the good order and welfare of the school."

If this case were held to fall within the limitations on the authority of school boards and teachers expressed in the foregoing text, then no statute or rule banning secret societies could be sustained. The same contention was convincingly answered by Chief Justice Rugg, writing for the court, in *Antell v. Stokes,* supra:

"The rule of the school committee here attacked was well within the grant conferred by § 47. The power in this particular as set forth in § 47 manifestly extends to organizations designed to be operative away from the school premises and outside school hours. This is not an invasion of the domain reserved exclusively to home and family. Formal associations of pupils in connection with a public school possess possibilities of genuine harm to the reputation of the school and to the studious habits and personal character of the members. These factors intimately concern the general welfare in connection with the public schools. They properly may be regulated by rules adopted pursuant to legislative sanction."

To the same effect, see *Satan Fraternity v. Board of Public Instruction,* supra.

Like reasoning compels rejection of plaintiffs' claim that Rule 7 violates the pupils' right of assemblage (Art I, § 26, Oregon constitution) and rights guaranteed by the First and Fourteenth Amendments of the federal constitution. Plaintiffs cite *Meyer v. Nebraska,* 262 US 390, 67 L ed 1042, 43 S Ct 625, 29 ALR 1446, in which the Supreme Court held unconstitutional a state law which prohibited the teaching in

any school of any subject in any language other than English, and *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary,* 268 US 510, 69 L ed 1070, 45 S Ct 571, 39 ALR 468, where the court held that an initiative measure adopted by the people of this state, which required all children between the ages of 8 and 16 years to attend public schools was an unconstitutional interference with parental rights.

■ This court would be the last to sanction any unlawful interference with "the liberty of parents and guardians to direct the upbringing and education of children under their control." *Pierce v. Society of the Sisters,* supra. In that case Mr. Justice McReynolds, speaking for the court, said: "The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." To this eloquent expression, not only of a principle of constitutional law, but of a natural right as well, we give our full adherence. We would be loathe to see in this country any departure from the doctrine thus enunciated. But the difference between the regulation here challenged and the arbitrary interference with parental rights attempted by the German language law and the compulsory public school law, is so obvious that it requires no elaboration.

The plaintiffs also rely on *West Virginia State Board of Education v. Barnette,* 319 US 624, 87 L ed 1628, 63 S Ct 1178. This was the highly controversial "salute the flag" case in which it was finally determined that to compel a school child to give the customary salute to the flag and pledge of allegiance would be a violation of the freedom of conscience and religion guaranteed by the First and Fourteenth Amendments,

where participation in such a ceremony was contrary to the religious faith of the child and its parents. Of course, no such question is involved here.

■ There is nothing in Rule 7, nor in any other of the rules adopted by the school board, which prevents the minor plaintiffs from assembling and associating freely at any time and place, outside of school hours, approved by their parents, with children from other high schools, public or private. This is their constitutional right. But they have no constitutional right to be members of clubs organized in the high schools, and composed of children attending different high schools, and which the school board may have substantial reason for believing to be inimical to the discipline and effective operation of the schools. As Mr. Justice Holmes, when he was a member of the Massachusetts court, said, concerning the claim of a violation of his constitutional rights asserted by a policeman who was removed from office for engaging in political activities contrary to a police regulation: "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. City of New Bedford,* 155 Mass 216, 220, 29 NE 517. Nor does it make any difference that the minor plaintiffs may be required by law to attend some school, either public or private. See Oregon Laws 1951, Ch 572. That obligation is likewise their opportunity to receive an education at public expense in schools established pursuant to the provision of the state constitution, which reads: "The legislative assembly shall provide by law for the establishment of a uniform and general system of common schools." Art VIII, § 3. When they avail themselves of that opportunity they must, in the nature of things, submit to the discipline of the schools and to regulations reasonably calculated to promote

such discipline and the high purpose for which the schools are established—the education of youth, which is not limited to the imparting of knowledge, but includes as well the development of character and preparation for the assumption of the responsibilities of citizenship in a democracy. To attain these ends not the least in value of the lessons to be learned are the lessons of self-restraint, self-discipline, tolerance, and respect for duly constituted authority. In this regard parents and the schools have their respective rights and duties, which complement one another, and may be exercised and discharged in cooperation for the welfare of the child and the state.

Here, as it seems to us, for the court to interfere with the action of the school authorities now challenged would be little less than to constitute ourselves a school board for all the schools of the state. This is something we have neither the right nor the inclination to do.

The provision of the resolution which invests the superintendent with the power to suppress nonsecret societies which in his discretion he considers inimical to the best interests of the school pupils, the community, or the effective operation of the schools, is attacked as a delegation of "unconstrained authority." In connection with this claim attention is called to the fact that the superintendent has exempted from the ban clubs sponsored by national fraternal organizations, by religious organizations, national youth organizations, and civic organizations such as the Kiwanis Club. Similar discretion was granted in the statute sustained in *Lee v. Hoffman,* supra, and the regulation upheld in *Antell v. Stokes,* supra. The statute involved in *Bradford v. Board of Education,* supra, made an exception of the Order of Native Sons of the Golden

West and similar fraternal societies. A claim of invalid discrimination was rejected by the court. See, also, *Satan Fraternity v. Board of Public Instruction,* supra. The superintendent is not granted "purely arbitrary" discretion as in *Yick Wo v. Hopkins,* 118 US 356, 30 L ed 220, 6 S Ct 1064, cited by the plaintiffs. On the contrary, if it was necessary to give expression to the standard by which he is to be guided in exercising his discretion, that has been done in the resolution, and in our opinion the standard is adequate. See *Gundling v. Chicago,* 177 US 183, 44 L ed 725, 20 S Ct 633. If at any time the superintendent should be guilty of applying the regulation with "an unequal and oppressive mind," as in *Yick Wo v. Hopkins,* then the rule of that case could be invoked. We are unable to say from the record in this case that he has done so thus far. *Thornhill v. Alabama,* 310 US 88, 84 L ed 1093, 60 S Ct 736, also cited by the plaintiffs, involved the constitutionality of a statute which on its face was in conflict with the guarantee of freedom of speech in the First Amendment. The court struck the statute down. We think that the case is without bearing here.

The foregoing considerations lead us to the conclusion that the defendant School Board, in adopting the regulations here in question, acted within its authority, and that the regulations, particularly Rule 7, are reasonable and constitute a measure taken in good faith for the purpose of stamping out secret societies in the high schools under the Board's jurisdiction, in accordance with the duty imposed upon it by law. These things being so, the court has no power to interfere with the Board's action. The decree dismissing the suit will, therefore, be affirmed, without costs to any of the parties.

APPENDIX

# RESOLUTION

WHEREAS, secret societies of every kind and character, including fraternities and sororities, so called, are contrary to state law, and

WHEREAS, the state law imposes upon the School Board the duty of suppressing such organizations within the public schools of this district and to that end authorizes the School Board to suspend or expel from schools in its discretion all pupils who engage in the organization or maintenance of such societies, and

WHEREAS, clubs and organizations other than secret societies, organized and maintained by school pupils can become and be inimical to the best interests of the schools pupils, the community, or the effective operation of the schools, now therefore

BE IT RESOLVED, that the Superintendent be and hereby is directed to suppress secret societies of every kind and character, including fraternities and sororities, so called, and also clubs and organizations other than secret societies which the Superintendent in his discretion considers inimical to the best interests of the school pupils, the community, or the effective operation of the schools, by suspending or expelling, within the Superintendent's discretion, from any public school within District No. 1, any pupil or pupils who engage in the organization or maintenance of such groups or organizations, or are members thereof.

BE IT FURTHER RESOLVED, the school clubs shall not be banned which have been approved and chartered by the high school principal *on conditions established by the Superintendent of Schools,* and

BE IT FURTHER RESOLVED, that the foregoing

action be instituted forthwith, and the pupils and parents be notified thereof and their cooperation solicited in making the program effective.

BE IT FURTHER RESOLVED, that the Administration, school principals, and teachers work toward the achievement of a larger number and variety of high school sponsored clubs, organizations, and activities, that responsible parent sponsorship of clubs be encouraged and accepted, and that the School Board proceed as promptly as possible, within the limitations of the budget, to provide needed facilities, such as recreation rooms and gymnasiums.

## TENTATIVE CONDITIONS

I. All organizations of pupils within the public schools shall be approved by the central school administration. To be approved an organization shall obtain a charter from the school in which it is to be organized. Before a charter shall be granted the applying organization shall submit an application showing:

1. Sponsoring group.

2. An adult advisor or advisors to be in charge of the organization.

3. A constitution.

4. The purposes of the organization and the standards upon which membership shall be based.

5. A list of officers and members.

6. A copy of any ceremonial or initiation.

7. Shall submit a statement that the organization will not pledge any of its members to secrecy as to ritual, purpose, activities, or membership.

II. The following rules and regulations shall pertain to all groups or organizations chartered by the school.

1. Adult advisors who have been approved by the school principal shall be present for the entire session of all functions of said organizations.

2. Substitute of sponsors or advisors without the approval of the school is prohibited and violation shall constitute a loss of charter.

3. The list of members shall be current and on file in the school office at all times.

4. Before a pupil may be asked to join an organization, his name must be submitted to the principal of the school and approved by him.

5. Organizations shall submit for school approval a list of any meetings or activities to be held.

6. Semi-annual financial statements showing monies collected and disbursed shall be submitted to the school. Any activities designed to raise money shall have the approval of the principal.

7. Members of any chartered organizations shall be regularly enrolled high school students from one high school student body. Graduates or students who have dropped from school shall not be permitted to retain membership. Public school students who were bona fide members of an inter-school club prior to October 27, 1949, may retain membership in any club that qualifies for a charter.

8. All activities of chartered organizations taking place within the school must have the approval of the principal.

9. No initiation ceremonies may be conducted that have not been approved by the school principal.

10. No initiation ceremonies may be conducted unless they are open to the school staff and the parents of inductees.

11. Membership in a chartered organization shall

be determined by vote of the group. Not more than a two-thirds affirmative vote of said members shall be required for admission.

12. Groups shall not engage in such activities as hazing, "dogging," or any other type of preinitiation activities.

13. No "rush" period shall be carried on by any organization.

14. Any candidate accepting an invitation to join an organization shall be considered as elected. There shall be no post-bid screening of members.

15. First year pupils shall engage only in freshman activities designated by the school. No chartered group or organization shall entertain first year pupils without the approval of the school principal.

16. Only approved pins or insignia shall be worn.

17. Any organization which fails to receive a school charter, or has its charter revoked, shall disband within a five day period after receiving notice from the school principal. Any members of said organizations who, subsequent to the five day period, still engage in group membership shall be liable to suspension or expulsion.

18. Groups shall not organize inter-school groups without the approval of the Superintendent of Schools.