Argued October 24, 1972, reversed and remanded February 2,
petition for rehearing denied March 2, petition for
review denied May 30, 1973

NEUHAUS ET AL, *Appellants, v.* FEDERICO ET AL,
*Respondents.*

505 P2d 939

*Clemens E. Ady,* Salem, argued the cause for appellants. With him on the brief were Ady & Blair, Salem.

*Robert W. De Armond,* Salem, argued the cause for respondents. With him on the brief were De Armond, Sherman & Barber, Salem.

Before Schwab, Chief Judge, and Foley and Thornton, Judges.

SCHWAB, C.J.

While enrolled as students at Cascade Union High School, the four plaintiffs were suspended by the defendant school officials on the sole ground that they were in violation of the following rule applicable to male students: "Hair must be kept off the ears [and], collar * * *." Plaintiffs appeal from a circuit court decision upholding the validity of their suspensions.

The essence of the plaintiffs' position is that the maximum hair length rule is invalid. They base this argument on a variety of constitutional grounds. Likewise, the vast majority of American courts that have recently considered school hair length regulations have only discussed constitutional issues. *See,* Annotation, 14 ALR3d 1201 (1967); Note, 84 Harv L Rev 1702 (1971).

However, one commentator has suggested that the extent of school officials' statutory authority to enact hair length rules should first be considered:

"* * * A preoccupation with constitutional issues has distorted both the constitutional and nonconstitutional questions involved. For example, the issue of the power of a school board to prohibit extreme hair and dress styles often has been joined as freedom of expression versus state power, distorting both the first amendment and the legislative delegation of power to school boards * * *." Goldstein, *The Scope and Sources of School Board Authority to Regulate Student Conduct and Status: A Nonconstitutional Analysis,* 117 U Pa L Rev 373, 377 (1969).

Relying heavily on Goldstein, supra, one court has recently held, without referring to the constitution, that a school board did not have authority to enact such rules. *Pendley v. Mingus Union High School Dist. No. 4,* 498 P2d 586 (Ariz App 1972). Thus, we begin by considering the extent of a school board's authority in this context.

■ A school board, like any other agency of government, has only that authority granted by statute. *Monaghan v. School District No. 1,* 211 Or 360, 315 P2d 797 (1957); *School Dist. 106 v. New Amsterdam Cas. Co.,* 132 Or 673, 288 P 196 (1930); *Baxter v. Davis,* 58 Or 109, 112 P 410, 113 P 438 (1911).

The relevant statutes provide:

"(1) The State Board of Education in accordance with ORS chapter 183 shall prepare and promulgate to all school districts minimum standards for pupil conduct and discipline and for rights and procedures pertaining thereto that are consistent with orderly operation of the educational processes and with fair hearing requirements.

"(2) Every district school board shall adopt and attempt to give the widest possible distribution of copies of reasonable written rules regarding pupil conduct, discipline and rights and procedures pertaining thereto. Such rules must comply with minimum standards promulgated by the State Board of Education under subsection (1) of this section." ORS 339.240.

"(1) Public school pupils shall comply with rules for the government of such schools, pursue the prescribed course of study, use the prescribed textbooks and submit to the teachers' authority.

"(2) The district school board may authorize the discipline, suspension or expulsion of any refractory pupil.

"(3) Wilful disobedience, open defiance of a teacher's authority or the use of profane or obscene language is sufficient cause for discipline, suspension or expulsion from school.

"(4) Expulsion of a pupil for any cause shall not extend beyond the current term or semester." ORS 339.250.

"Each district school board may establish rules for the government of the schools and pupils consistent with the rules of the State Board of Education." ORS 332.107.

ORS 339.240 was enacted in 1971. Oregon Laws 1971, ch 561, sections 2 and 3, p 981. ORS 339.250 was enacted in 1965. Oregon Laws 1965, ch 100, section 289, p 210. Neither ORS 339.240 nor ORS 339.250 has previously been interpreted by an Oregon appellate court. ORS 332.107 dates from 1951. Oregon Laws 1951, ch 588, section 3, p 1047—originally codified as ORS 336.030, renumbered 332.107 in 1965. ORS 332.107 has been mentioned in some cases, but none involving a question of the extent of a school board's authority to enact rules governing student conduct. *See*, e.g., *Dilger v. School District 24CJ*, 222 Or 108, 352 P2d 564 (1960);

*Owens v. School District,* 3 Or App 294, 473 P2d 678 (1970). Thus, the question of the school board's authority in this context is a novel one.

■ We interpret ORS 339.240, 339.250 and 332.107 to mean that a school board's authority to enact rules governing student conduct is limited to enacting rules that have some reasonable connection with the educational process.

The plain language of those statutes so provides. The repeated references to rules regarding *"pupil conduct"* (emphasis supplied), ORS 339.240(1), 339.240 (2), and rules for the *"government"* (emphasis supplied) of the public schools, ORS 339.250(1), 332.107, make it apparent that any school board's authority is limited to promulgating rules that have some reasonable connection with the operation of the public schools. "* * * [A] school board is * * * created to regulate matters of concern to public education [and does not have] * * * general legislative power over youths in its geographic territory * * *." Goldstein, supra, at 387.

This conclusion is reinforced by two additional considerations: students' rights to attend public school, and parents' rights to control the rearing of their school-age children.

■ Residents of this state between certain ages have the right, and even the duty, to attend public schools.[1]

"* * * [T]he district school board shall admit

---

[1] *Compare* Ward v. Flood, 48 Cal 36, 17 Am R 405 (1874), *with* The State ex rel. Adams v. Burdge and others, 95 Wis. 390, 70 NW 347, 37 LRA 157, 60 Am St R 123 (1897):

"* * * The advantage or benefit thereby vouchsafed to each child, of attending public school is, therefore, one derived

free of charge to the schools of the district all persons between the ages of 6 and 21 residing therein * * *." ORS 339.115(1).

"Except as provided in ORS 339.030, all children between the ages of 7 and 18 years who have not completed the 12th grade are required to attend regularly a public full-time school of the school district in which the child resides." ORS 339.010.

In addition, the Supreme Court has stated it "is the public policy of" this state "to afford all children of school age a reasonable opportunity to attain, at least, a common school education." *Rysdam v. School District No. 67*, 154 Or 347, 351-52, 58 P2d 614 (1936).

■ Reading all of the above-quoted statutes together, it is clear that school officials' general authority to make and enforce rules can take precedence over students' rights to attend public school. That is to say, a student's right to attend school is necessarily subordinated to the school officials' right to enforce rules when enforcement results in the student's suspension or expulsion.

However, because there is this possible conflict between the students' right to attend and the school officials' right to suspend or expel, reading all the above-quoted statutes together leads to the further

and secured to it under the highest sanction of positive law. It is, therefore, a right—a legal right—as distinctively so as the vested right in property owned is a legal right, and as such it is protected, and entitled to be protected by all the guarantees by which other legal rights are protected and secured to the possessor." Ward v. Flood, 48 Cal at 50.

"* * * Whether it [a student's access to public school] be called a right or privilege cannot be important, for in either view it was secured to the relator, and to his children as well, by the positive provisions of law, and was to be enjoyed upon such terms and under such conditions and restrictions as the law-making power, within constitutional limits, might impose." The State ex rel. Adams v. Burdge and others, 95 Wis at 399.

conclusion that rules of student conduct promulgated and enforced by school officials have to have some reasonable connection with the function of the schools. Otherwise, school officials could promulgate any rule they wished in such a manner that could effectively destroy the students' statutory right to attend public schools. *See, Nutt v. Board of Education,* 128 Kan 507, 509, 278 P 1065 (1929):

> "The public schools are for the benefit of children within school age, and efficiency ought to be the sole object of those charged with the power and privilege of managing and conducting the same, and while great care should be taken to preserve order and proper discipline, it is proper also to see that no one within school age should be denied the privilege of attending school unless it is clear that the public interest demands the expulsion of such pupil or a denial of his right to attend * * *."

Another group with important interests at stake is the parents of public school students. The Oregon Supreme Court has described parents' interests in these terms:

> "In support of the contention that the rule violates parental authority counsel for the plaintiffs cite 47 Am Jur, Schools, 426, § 173, where it is said:
>
>> " 'It has been held that school directors and teachers have no concern with the individual conduct of pupils wholly outside the schoolroom and school grounds when they are presumed to be under the control of their parents. It has been said that when the schoolroom is entered by a pupil, the authority of the parent ceases and that of the teacher begins; when the pupil is sent to his home, the authority of the teacher ends, and that of the parent is resumed * * *.'
>> "* * * * *
>
> "This court would be the last to sanction any

unlawful interference with 'the liberty of parents and guardians to direct the upbringing and education of children under their control.' *Pierce v. Society of the Sisters,* supra [268 US 510, 45 S Ct 571, 69 L Ed 1070, 39 ALR 468 (1925)]. In that case Mr. Justice McReynolds, speaking for the court, said: 'The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.' To this eloquent expression, not only of a principle of constitutional law, but of a natural right as well, we give our full adherence. We would be loathe to see in this country any departure from the doctrine thus enunciated * * *." *Burkitt et al v. School District No. 1, et al,* 195 Or 471, 495-97, 246 P2d 566 (1952).

■ The possibility of a conflict between requirements imposed on students by school officials and requirements imposed on their children by parents is further documentation of the need to interpret school officials' statutory authority in this context as limited to enacting rules having a reasonable relation with the proper operation of the schools.

Thus, under our interpretation of the controlling statutes, ORS 339.240, 339.250, and 332.107, the issue of whether the school board has authority to adopt the disputed maximum hair length rule comes down to the question of whether there is any reasonable connection between long hair and education in the public schools. While this is a fact question, and each case must be decided on its own facts, there are certain legal principles available to facilitate such a determination.

The strongest case can be made to establish that a given rule of student conduct is connected with the educational process by showing the rule regulates only

in-school activity. For example, *Stromberg v. French,* 60 ND 750, 236 NW 477 (1931), involved a school rule that provided students could not wear metal plates on their shoes while in school. Finding that the metal plates caused damage to floors and disruptive amounts of noise, the rule was upheld. But students who felt strongly enough about it to carry an extra pair of shoes to school remained completely free to wear metal-plated shoes to school in the morning and then put metal-plated shoes back on as soon as they left school in the afternoon. The challenged rule regulated *purely* in-school activity.[2]

At the other extreme would be a school rule that regulates only out-of-school conduct. It would be much more difficult, if not impossible, to establish the requisite educational basis necessary to find statutory authority to enact such a rule. For example, *Dritt v. Snodgrass,* 66 Mo 286, 27 Am R 343 (1877), involved a challenged school rule that prohibited pupils from attending parties during the evening, presumably with the hope that they would study more. The court stated:

> "* * * For his conduct when at school, he may be punished or even expelled, under proper circumstances; for his conduct when at home, he is subject to domestic control. The * * * [school board], in prescribing the rule that scholars who attend a social party should be expelled from school, *went beyond their power,* and invaded the right of the parent to govern the conduct of his child, when solely under his charge." 66 Mo at 298. (Emphasis supplied.)

[2] Of course, school rules concerning attire may be subject to constitutional attack. *See,* Tinker v. Des Moines School Dist., 393 US 503, 89 S Ct 733, 21 L Ed 2d 731 (1969); *compare* Burnside v. Byars, 363 F2d 744 (5th Cir 1966), *with* Blackwell v. Issaquena County Board of Education, 363 F2d 749 (5th Cir 1966). We are here, however, only considering the scope of school board substantive rulemaking power under the relevant Oregon statutes.

*See also, Hobbs v. Germany,* 94 Miss 469, 49 So 515 (1909) (rule requiring students to remain in homes and study between 7 p.m. and 9 p.m. held beyond authority of school board to enact).

The in-school-activity versus out-of-school-activity dichotomy is not conclusive. Courts in other states have held rules regulating purely in-school conduct to be invalid, e.g., *State ex rel. Bowe v. Board of Education of the City of Fond du Lac,* 63 Wis 234, 23 NW 102, 53 Am R 282 (1885) (rule required students returning from recess to carry in wood for stove), and have held rules regulating out-of-school conduct to be valid, *see,* Goldstein, supra, 117 U Pa L Rev 373 at 383, n 41. Also, it is generally assumed that school officials have authority to exercise some control over student conduct while students are coming to or going from school, and while students are at school-sponsored functions away from the school building itself, if the control is found to be functionally related to education. *See, O'Rourke v. Walker,* 102 Conn 130, 128 A 25, 41 ALR 1308 (1925). In all situations the ultimate question remains whether there is any reasonable connection between the school's rule and the school's role of educating. While it is not conclusive, the in-school-activity versus out-of-school-activity dichotomy can be helpful in assessing the evidence as it bears on this ultimate question.

In this case, the challenged maximum hair length rule regulates conduct that falls between the two extremes of being purely in-school and being purely out-of-school. While the rule may have been intended to control hair length only during school hours, the necessary effect of the rule is to control hair length 24 hours a day. Hair is not like metal-plated shoes, *Stromberg v. French,* supra, or any other article of

attire that can be changed at will. In the very nature of things, hair cannot be short while a student is in a school building and long when he leaves the school building.

"* * * [I]t would be impossible to comply with the long hair regulation during school hours and follow the wishes of the students and their parents as to hair length outside of school * * *." *Breen v. Kahl,* 419 F2d 1034, 1038 (7th Cir 1969), *cert denied* 398 US 937 (1970).

"* * * [A] school rule which forbids skirts shorter than a certain length while on school grounds would require less justification than one requiring hair to be cut, which affects the student twenty-four hours a day, seven days a week, nine months a year * * *." *Richards v. Thurston,* 424 F2d 1281, 1285 (1st Cir 1970).

"* * * [A] regulation requiring a student to shorten his hair effects a substantial intrusion into his private life in a way that is important to him, *where the school board has no authority or reason to interfere." Karr v. Schmidt,* 460 F2d 609, 624-25 (5th Cir 1972) (dissenting opinion) (emphasis supplied).

The impact of a hair length rule is to regulate out-of-school conduct more than in-school conduct. *Richards v. Thurston,* supra. Students are in or around high schools about 7 hours a day, about 180 days a year, for a total of 1260 hours. Yet there are about 5340 additional hours in a nine-month academic year. Requiring hair to be short for the 1260 in-school hours necessarily requires hair to be short the additional 5340 out-of-school hours. Accordingly, we approach the hair length rule here in question as being more akin to a rule forbidding students from attending parties in the evenings, *Dritt v. Snodgrass,* supra, than

a rule prohibiting metal-plated shoes in school, *Stromberg v. French,* supra.

Against this background, we turn to the evidence in this case to determine whether any reasonable connection was established between hair on males longer than permitted by the rule in question and the proper operation of the public schools—a factual showing necessary to find the adoption of the rule to be within the school board's authority.

The thesis of the school officials who testified in support of the hair length rule appears to be that hair on a male student that is over the top of his ears on the sides or over the top of his shirt collar in the back disrupts the proper educational atmosphere in the schools by distracting other students. No claim is made in this case that the plaintiffs' long hair is unclean or unsanitary. *See, Carr v. Dighton,* 229 Mass 304, 118 NE 525 (1918) (pupils excluded from school because they had "head lice"). Indeed, the portion of the dress code relating to hair in effect at the time of plaintiffs' suspension had no requirements as to cleanliness of hair. Nor do we understand the defendant school officials to contend that long hair on male students creates a safety problem in laboratory classes around Bunsen burners, in shop classes around machinery or in gym classes.[9] The factual question comes

[9] In Crews v. Cloncs, 432 F2d 1259 (7th Cir 1970), school officials sought to justify a hair length rule for male students on grounds of safety. The court reasoned:

"* * * [A]lthough girls engage in substantially the same activities in gym and biology classes, only boys have been required to cut their hair in order to attend classes. * * * [D]efendants have offered no reasons why health and safety objectives are not equally applicable to high school girls. On the present record, therefore, we believe that defendants'

down to just whether hair longer on male pupils than permitted by the Cascade Union High School rule disrupts the educational process.

The four student-plaintiffs testified that their long hair had never caused any disruption, and that they had never been involved in any discipline problems before the long hair issue arose. Two teachers from different Salem high schools testified for the plaintiffs. They stated they had taught while a maximum hair length rule was in effect in Salem, that the rule had been dropped a few years ago, and that their experiences indicated the presence of such a rule had not added to the educational process, or, stated differently, the absence of such a rule had not detracted from the educational process.

Educators testifying for the defendants stated that in their *opinions* long hair on male students *could* be disruptive, and, thus, they believed the maximum hair length rule to be necessary to promote the educational process. As we read the record, none of these defense witnesses documented a factual basis for his opinion that there was any *cause and effect* relationship between short hair and better education or between long hair and inferior education. Representative samples of the testimony of these defense witnesses are set out as an appendix to this opinion.

■ Oregon cases state that, in general, a school rule is presumed to be valid, and the burden is on the chal-

_____

action constitutes a denial of equal protection to male students." 432 F2d at 1266.

Moreover, all parties to this case seem to agree that it would be reasonable to require students of either sex to wear a protective headband or cap when safety requires.

lenging party to establish invalidity. *Burkitt et al v. School Dist. No. 1 et al,* supra, 195 Or at 491-93;[4] *Padberg; West et al v. Martin et al,* 225 Or 135, 141-42, 357 P2d 255 (1960). However, when the question is whether a school board has authority to *adopt* a rule, the burden may be on the school board to "show that its regulation falls within a clearly defined statutory grant of authority." *Ore. Newspaper Pub. v. Peterson,* 244 Or 116, 123, 415 P2d 21 (1966).

■ We need not resolve any burden-of-proof questions in this case. The plaintiffs came forward with

---

[4] It should be noted that in Burkitt et al v. School Dist. No. 1 et al, 195 Or 471, 246 P2d 566 (1952), relied on heavily in the dissenting opinion, the school board had adopted the challenged rules pursuant to explicit statutory authority conferred by what is now codified as ORS 336.610. Thus, that case did not present any question of the scope of the school board's statutory authority.

Moreover, it is difficult to follow the reasoning of the dissent in asserting it is "unjustified" for Oregon courts to determine what authority a unit of Oregon government has under controlling Oregon statutes. *See,* Goldstein, *The Scope and Sources of School Board Authority to Regulate Student Conduct and Status: A Nonconstitutional Analysis,* 117 U Pa L Rev 373 at 430:

"Under our system, the ultimate responsibility for determining the validity of school board rules rests with the judiciary. As a result, courts are called upon to make difficult determinations that necessarily merge into areas of educational policy, judgments they are naturally reluctant to make. Yet, absent more definite legislative standards in educational enabling acts, this is a task they must continue to perform."

*See, generally,* L. Jaffe, *Judicial Control of Administrative Action* 327 (1965):

"* * * The constitutional courts are the acknowledged architects and guarantors of the integrity of the legal system. * * * The statute under which an agency operates is not the whole law applicable to its operation. An agency is not an island entire of itself. It is one of the many rooms in the magnificent mansion of the law. The very subordination of the agency to judicial jurisdiction is intended to proclaim the premise that each agency is to be brought into harmony with the totality of the law, the law as it is found in the statute at hand, the statute book at large, the principles and conceptions of the 'common law,' and the ultimate guarantees associated with the Constitution."

evidence that their hair length had not caused disruptions and evidence from two teachers that their experiences were no different when a hair length rule was in effect and when none was in effect. At this point it was incumbent on the defendant school officials to come forward with something more than pure opinion, that is, with some factual basis for their opinions that there was a connection between length of hair and quality of education. This they failed to do. *See,* Appendix to this opinion.[5]

We hold that the record in this case does not establish that the promulgation and enforcement of the hair length rule here in question was within the authority of the school board under ORS 339.240, 339.250 and 332.107.

Our holding makes it unnecessary to reach the constitutional issues briefed at length by the parties. We only note that a majority of the federal circuits have held that students do have a constitutional right to control the length of their hair. *Stull v. School Board of Western Beaver Jr.-Sr. H.S.,* 459 F2d 339 (3rd Cir 1972); *Massie v. Henry,* 455 F2d 779 (4th Cir 1972); *Bishop v. Colaw,* 450 F2d 1069 (8th Cir 1971); *Richards v. Thurston,* supra; *Breen v. Kahl,* supra. A minority have reached the opposite result. *Karr v. Schmidt,* supra; *Freeman v. Flake,* 448 F2d 258 (10th Cir 1971), *cert denied* 405 US 1032, 92 S Ct 1292, 31 L Ed 2d 489 (1972); *King v. Saddleback Junior College Dis-*

---

[5] We recognize that opinion, i.e., the professional expertise of school officials, is not always an insufficient basis for action. We doubt that a rule against pupils' carrying weapons in school would have to be supported by evidence of prior incidents involving their improper use. Conversely, we doubt that a rule as to shoe color could stand absent factual support of the professional opinion that such a rule is necessary for the proper functioning of schools. We think hair length is more closely akin to the latter.

*trict,* 445 F2d 932 (9th Cir 1971), *cert denied* 404 US 979 (1972); *Jackson v. Dorrier,* 424 F2d 213 (6th Cir), *cert denied* 400 US 850 (1970).

One final issue requires brief comment. There is much mention in the record and briefs of the fact that students, teachers and parents all participated in the drafting of the hair length rule. A student committee drafted the entire dress code, including the hair length rule. A majority of the Cascade Union High School student body voted to approve the dress code. Also, students participate in the enforcement of the dress code by sitting on a Dress Code Grievance Committee.

■ It is laudable that school officials permit this degree of student input before adopting and in enforcing rules of student conduct. The fact remains, however, that the hair length rule was adopted by the school board, not the student body, and is ultimately enforced by the school officials, not the student body. Students can only be suspended—as the four student-plaintiffs were—by school officials, not their fellow students, for violation of rules adopted by the school board, not their fellow students. ORS 339.250(2). The majority of the student body may be free to enact rules other than those of the school board, but under Oregon statutes suspension is not an available sanction for violation of such a student-enacted rule.

■ Furthermore, the statutory authority given to school administrators to control the conduct of an individual pupil cannot be expanded or contracted by a vote of other pupils.

Reversed and remanded for entry of a decree in accordance with this opinion.

**APPENDIX**

By Mr. Federico, principal at Cascade Union High School:

"Q   Now, at one time, one of the plaintiffs, in January, as I recall it, was suspended—Mr. Neuhaus—well, at least he said he was suspended, and secured a temporary restraining order permitting him to get back in school. During that period of time, were you able to enforce the dress code, because of the temporary injunction?

"A   No—when you say were we able to enforce it, I feel that the attitude and the atmosphere had changed completely at school during the injunction time, because I felt, and this is personal, that the kids were waiting, and a lot of them were a little aggravated primarily because they were waiting on their own action pertaining to their dress code. We had vandalism within the building that we never had before.

"Q   Did you have other disciplinary problems?

"A   Yes, and I can't say that it is directly related, but we did have, during that time.

"Q   And then, was there a change, after that case was dismissed?

"A   Yes.

"Q   What was the nature of the change?

"A   Well, I feel that it's more—we're back to our normal situation. The kids seem to feel that, through the due process that they followed, that something did take place, and they were very pleased, the majority of them, with the actions that they followed, and overall attitude within the school, and atmosphere, is very good.

"Q   What about discipline?

"A   Discipline is very good at this time.

"Q   And it was different?

"A   Yes, there seemed to be a time there that it was a little different.

"*   *   *   *   *

"Q * * * Do you feel that if these four boys are let back into school by the Court, that this might have a disruptive effect upon the other students in the Cascade Union High who are attempting to comply with the code?

"A In my opinion, yes.

"* * * * *

"Q Now, Mr. Federico, prior to the last temporary injunction that was issued, did you have any discipline problems at all?

"A Oh, yes.

"Q You had a much stronger dress code in effect, didn't you, at that time?

"A But not as many. Little things—vandalism, throwing soap into the toilet bowls, marking up the ceiling, this type of thing.

"Q And you didn't have those problems before?

"A Oh, yes, we did—not the toilet bowl situation.

"Q You had one toilet bowl incident that you hadn't had before?

"A A number that we never had before.

"Q A number? Can you relate that to the length of hair, or to the temporary injunction by the Court, Mr. Federico?

"A Well, actually, I probably couldn't, but it did happen during that time.

"* * * * *

"* * * The other thing, you testified in response to Mr. DeArmond's question, if this Court should allow these students back in school on a temporary basis, pending the determination of the basic question, this would be disruptive to the other students.

"A I said in my opinion.

"Q Yes. Why?

"A Well, one situation—can I quote a situation?

"Q I want to know why you have this opinion.

"A Well, I felt—I came around a hall, and this was during Nick's situation, and one of the students was rumpling his hair, and there seemed to be a heated thing between them, until they saw me, and they both went their separate ways. I hope this doesn't take place, and I know that we can't be watching everything at all times, but I think the other disruptive situation is the students felt that they went through due process—we live in a democratic society. They have made arrangements to follow through with this process, and they, in my own opinion, maybe would feel that, because the boys would be admitted in school without going through due process, that the democratic process isn't what it's set out to be.

"Q Don't you think the students might think that going through a court process, and seeking statutory relief is following due process also?

"A It could be."

By Mr. Brown, assistant principal at Cascade Union High School:

"Q Do you have an opinion as to whether or not a code is or is not necessary in connection with the proper education, the educational process, at Cascade Union High?

"A Yes.

"Q What is that opinion?

"A The opinion is that restrictions are needed to provide an atmosphere of learning for the total group, and to elaborate on that, such things as good dress, grooming, hair, cleanliness, health and safety —all of these things are part of the total thing.

"Q Do you feel that there is some connection between the code and the obligation of the district to promote and develop upright and decent citizens?

"A I think it's the responsibility of the community, the board, the administration, the teachers, all people involved, to provide a code, yes.

"* * * * *

"Q   Can you directly relate in your own mind, using your education, your background, your own intelligence, and directly relate the length of hair to intelligence?

"A   You cannot directly relate length of hair with intelligence.

"Q   Can you directly relate length of hair with discipline?

"A   Yes, because of the attitudinal changes.

"Q   You think length of hair changes someone's attitude?

"A   In some cases, yes."

By Mr. Archer, superintendent of Cascade Union High School District:

"Q   Now, do you, based upon your experience in the field of education both as a teacher and as an administrator, do you feel that there is a definite relationship between appearance on one hand and student conduct and discipline on the other?

"A   There is absolutely no question as to the overall appearance and related conduct. There has been many studies. I can't quote right now, but there are several that definitely state and shows, after much research, that even with a change of a single set of codes, which is grooming, that also a change in attitude results, and consequently, if attitude changes, behavior changes.

"Q   Then there is a possibility, then, that when there may not be a code, there is a potential decline in discipline and attitude and beneficial educational process?

"A   I personally believe that there is.
"* * * * *

"Q   And you think that length of hair on an individual will necessarily change his discipline, is that correct?

"A   I can substantiate, I'm sure, that with the

length of hair, and we are speaking in general, per se, that again, if we resort to overt physical characteristics, we're going to develop a role in which some way we're going to fill that role, and there will be overt frustrations and behavioral changes.

"* * * * *

"Q Do you feel that long hair or hair over the collar, in violation of the Cascade code, is dangerous to society in any way?

"A The attitude that could be developed, and behavioral changes that could come from that attitude, I would not say it could be dangerous, but it could certainly be unpleasant.

"* * * * *

"I feel that if we allow students to dress as they wish, I not only feel this way, I can, again, in time, scientifically, by research, if allowed, we can prove that there is a decline in discipline—when there is a decline in one's personal pride, when we come dressed any way that we wish, you can't tell me that there is going to be pride in that person, to be accepted by the group, his peer group, at that time."

By Mr. Lino, principal at North Marion High School:

"Q Now, did the North Marion High School district have a dress code?

"* * * * *

"A Yes, three years ago we had a code, and it was eliminated at that point.

"* * * * *

"Q Could you tell us whether or not there was a difference in your disciplinary problems before the code, and after the code had been eliminated?

"* * * * *

"A * * * [T]here definitely, in my observation, and substantiated by my records in the office, has been a difference in the attitude and behavior

in the school. When we had a structured code, and then when it was eliminated, there seemed to be a lack of, or a loss in pride in the building, and what the program was about, and what the purpose of the school was, athletically, academically, the whole works. The attitude just seemed to fall down.

"Q   And you're now referring to after your code went out?

"A   Right.

"Q   And, now, can you relate this drop in attitude and discipline to the grooming of the students?

"A   Yes, I can. * * * [W]hen we had the code, students were behaving, in my opinion, better. There was little behind your back vandalism, and things of this nature—very little, and this is on the increase now. What it amounts to is they are acting the way they are dressing, and this has been the sole thing that we have been able to put the tag on.

"* * * * *

"Q   Can you give us some of those incidences, or do you have any figures?

"A   Most of them would be incidences rather than figures. This year, for example, I can quote you in the five words what our dress code is: neat, clean, appropriate, sanitary, and something on that order—and students have felt that, in order to express themselves, that they can wear all sorts of garb, and this garb has definitely interfered with our program. I'm going to be talking about extremes —extreme vulgarities written across T-shirts, and so forth, that's come to school; and this sort of thing definitely interferes with the whole program."

By Mr. Brown, principal of Canby High School:

"Q   What is the nature of your code at the present time, as far as hair grooming is concerned?

"A   Very similar to Cascade's.

"Q Now, at one time, were you faced with a situation where the code was not, you might say, in existence?

"A Yes, we had a time where we had no code. It was in suspense, I guess you might say. Well, the code was in existence, but parents were free to come in and sign a waiver to deviate from that code.

"Q And permit their children as students to deviate from the code?

"A Right.

"Q And this was pending a determination as to whether your code would or would not be set aside?

"A Right.

"Q Now, during this period of time, while that code was in somewhat of a suspension and you had your waiver system, did you find, from your observation, that there was a difference in the attitude and discipline of the students in Canby High School?

"A Definitely.

"Q What was that difference?

"A Very much the same things that have been reiterated here previously—particularly, changes in attitude, changes in respect for self, and changes in respect for others.

"Q Now, did these attitudes and changes reflect upon the education that was either received by the individual or did that have any effect upon the education which that individual received?

"A Yes, I think it follows, if there is a distinct attitudinal change, an adverse attitudinal change, there is going to be a change in the educational process.

"Q Now, did this also have a disruptive effect on the overall educational process?

"A I would say yes, that it did. There was cer-

tainly more problems during this time than there had been previously.

"Q Now, do you think that there is or is not a definite relationship between the appearance and grooming of a student and his conduct and discipline?

"A Yes, I would have to say definitely yes.

"Q And what is that, or what is this direct relationship?

"A Well, I think I have to repeat just what I said previously, that if a person doesn't care about their personal appearance, how they look, that there is a correlation between that and the way they act, particularly toward others.

"* * * * *

"Q What if * * * [a student's head] were completely shaved?

"A There would be no problem at all.

"Q You could shave your head completely, because that wouldn't create a discipline problem—that wouldn't cause a breakdown, would it?

"A No, because that is not in violation of any of the established code.

"Q Well, if your hair is to the middle of the back, that would cause a breakdown, is that correct?

"A Yes, because it would be a direct violation of established code."

By Mr. Woods, teacher at Judson Junior High School:

"Q * * * Is there a definite relationship between grooming and appearance of a student and students' conduct and discipline?

"A Yes, when you dress like you're going to the bean yard, you act like you're going to the bean yard."

THORNTON, J., dissenting.

In my view the defendant school board, in adopting the challenged regulation, was acting within the scope of its discretion, and therefore judicial intervention is unjustified.

The leading Oregon case dealing with judicial review of school board regulations is *Burkitt et al. v. School Dist. No. 1, et al.,* 195 Or 471, 246 P2d 566 (1952). In *Burkitt* our Supreme Court sustained against a similar attack a Portland school board rule forbidding inter-high school secret societies. The court quoted with approval the following statement from 47 Am Jur 328, Schools § 47, as follows:

> " 'Since the courts will not interfere with the exercise of discretion by school directors in matters confided by law to their judgment, unless there is a clear abuse of discretion or a violation of law, they are usually disinclined to interfere with regulations, adopted by school boards, and they will not consider whether the regulations are wise or expedient, but merely whether they are a reasonable exercise of the power and discretion of the board. The reasonableness of regulations is a question of law for the courts. Acting reasonably within the powers conferred, it is the province of the board of education to determine what things are detrimental to the successful management, good order and discipline of the schools and the rules required to produce these conditions. The presumption is always in favor of the reasonableness and propriety of a rule or regulation duly made.' " 195 Or at 492.

The *Burkitt* court also observed:

> "Here, as it seems to us, for the court to interfere with the action of the school authorities now challenged would be of little less than to constitute ourselves a school board for all the schools of the

state. This is something we have neither the right nor the inclination to do." 195 Or at 499.

As another court aptly pointed out in a similar case:

"Boards of Education, rather than Courts, are charged with the important and difficult duty of operating the public schools * * *. The Court's duty, regardless of its personal views, is to uphold the Board's regulation unless it is generally viewed as being arbitrary and unreasonable * * *." *State v. Marion Co. Bd. Ed.*, 202 Tenn 29, 34, 302 SW2d 57, 59 (1957).

The trial court in its opinion in the case at bar gave considerable weight to the testimony of the educators on the detrimental effect the prohibited hair styles had on good order and school discipline.

The presumption is in favor of the reasonableness and propriety of any such rule or regulation. *Burkitt et al. v. School Dist. No. 1, et al.,* supra.

After reviewing the testimony, I would agree with the trial judge's conclusion that there was sufficient evidence to show that the challenged regulation bore a reasonable relationship with school deportment and discipline and therefore did not constitute an abuse of the school board's discretion.

As the Supreme Court of Utah said in *Starkey v. Board of Ed. of Davis County Sch. Dist.,* 14 Utah 2d 227, 230, 381 P2d 718, 720 (1963):

"It is not for the courts to be concerned with the wisdom or propriety of the resolution as to its social desirability, nor whether it best serves the objectives of education, nor with the convenience or inconvenience of its application to the plaintiff in his particular circumstances. So long as the

resolution is deemed by the Board of Education to serve the purpose of best promoting the objectives of the school and the standards for eligibility are based upon uniformly applied classifications which bear some reasonable relationship to the objectives, it cannot be said to be capricious, arbitrary or unjustly discriminatory."