Argued and submitted Arpil 1, Court of Appeals reversed July 28, 1986

## COOPER,
*Respondent on Review,*

*v.*

## EUGENE SCHOOL DISTRICT NO. 4J,
*Petitioner on Review,*

*and*

## DUNCAN,
*Petitioner on Review.*

(CA A31423; SC S32472; S32469)

723 P2d 298

Margaret E. Rabin, Assistant Attorney General, Salem, argued the cause for petitioner on review, Verne A. Duncan, Superintendent of Public Instruction for the State of Oregon. With her on the petition were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Bruce E. Smith, Eugene, argued the cause for petitioner on review, Eugene School District No. 4J. With him on the petition were Jacquelyn Romm and Cass, Scott, Woods and Smith, Eugene.

Rohn M. Roberts, Eugene, argued the cause for respondent on review.

Leslie M. Swanson, Jr., Swanson & Walters, Eugene, filed an *amicus curiae* brief for American Civil Liberties Union of Oregon.

Before Peterson, Chief Justice, Lent, Linde, Campbell, Carson and Jones, Justices.

LINDE, J.

## LINDE, J.

When Janet Cooper, a special education teacher in the Eugene public schools, became a Sikh, she donned white clothes and a white turban and wore them while teaching her sixth and eighth grade classes. In a letter to the staff of the school where she taught, she wrote that she would wear the turban and often wear white clothing as part of her religious practice, and that she had explained this and other changes in her life to her students.[1] She continued to wear her white garb after being warned that she faced suspension if she violated a law against wearing religious dress at her work. The law provides, in ORS 342.650:

> "No teacher in any public school shall wear any religious dress while engaged in the performance of duties as a teacher."

and, in ORS 342.655:

> "Any teacher violating the provisions of ORS 342.650 shall be suspended from employment by the district school board. The board shall report its action to the Superintendent of Public Instruction who shall revoke the teacher's teaching certificate."

Pursuant to these statutes, the school superintendent, acting for the school board, suspended Cooper from teaching and reported this action to the Superintendent of Public Instruction, who, after a hearing, revoked Cooper's teaching certificate. This order was challenged on constitutional grounds in the Court of Appeals, which set aside the revocation of the teaching certificate as an excessive sanction under the court's understanding of federal First Amendment doctrine. *Cooper v. Eugene Sch. Dist. No. 4J,* 76 Or App 146, 708 P2d 1161 (1985). On petitions by the school district and the Superintendent of Public Instruction, we allowed review.

## I. THE AGENCY ORDER

At the outset, we must work our way through a number of problems that the parties and the Court of Appeals passed over in silence. The school district and the Superintendent of Public Instruction (hereafter "Superintendent" in distinction from the district's superintendent) seek a decision on the constitutionality of ORS 342.650 and 342.655, and this

---

[1] Cooper also had married and had changed her name to Karta Kaur Khalsa.

may also be the chief remaining objective of the teacher, who has moved to New Mexico and whose Oregon teaching certificate has been reinstated conditional upon compliance with the law. Nonetheless, this case like others is, and if possible should remain, a case of ordinary administrative and statutory law before becoming a constitutional case.[2] The case came before the Court of Appeals on judicial review of an order in a contested administrative proceeding to revoke a license, and it cannot be converted into a declaratory proceeding on the constitutionality of a statute to accommodate the parties.

The problems passed over in silence are, first, why the school district is a party to this proceeding; second, what was before the Superintendent for decision in a contested case; and third, whether the case is moot. A reading of the statutes makes evident how these problems are interrelated.

*Standing in the revocation procedure.* ORS 342.650 forbids a teacher to "wear any religious dress while engaged in the performance of duties as a teacher." ORS 342.655 directs the district school board to suspend the employment of any teacher who violates this proscription and to report its action to the Superintendent, "who shall revoke the teacher's teaching certificate." Obviously disputes may arise over exactly how a teacher was dressed, whether what she wore was "religious dress," what the teacher's "duties as a teacher" were, and whether she wore the "religious dress" while "engaged in the performance" of those duties. The agency that makes those determinations is the district school board. ORS 342.655 does not direct the Superintendent to reexamine the school board's findings and "action" and its underlying findings and conclusions before revoking the teacher's certificate. We do not foreclose an argument that could be made to the contrary, possibly under the Administrative Procedure Act, ORS 183.310(2)(a)(C), but none was made here.

The present version of ORS 342.650 and 342.655 was enacted in 1965 in a major revision of public education laws that included extensive provisions governing the certification,

---

[2] *See, e.g., Planned Parenthood Assn. v. Dept. of Human Res.,* 297 Or 562, 687 P2d 785 (1984). In *Neuhaus v. Federico,* 12 Or App 314, 505 P2d 939 (1973), the Court of Appeals found it unnecessary to enter the then raging dispute over the constitutionality of school hair length rules because the authority of school boards was limited to enacting rules related to the educational process.

employment, and discharge of teachers. Or Laws 1965, ch 100. These provisions were further amended during the same session by the Teacher Tenure Law, Or Laws 1965, ch 608. The Teacher Tenure Law entitled a permanent teacher to have a district superintendent's recommendation of dismissal reviewed by a panel of a Professional Review Committee and to a hearing by the school board before the board acted on the recommendation. In 1971, the law again was amended to provide review of a teacher's dismissal by a panel of the Fair Dismissal Appeals Board. Or Laws 1971, ch 570. These statutes are now found in ORS 342.805 to 342.930.[3] None of the parties nor the Court of Appeals addressed the question what substantive or procedural effects various provisions of the Teacher Tenure Law might have on a teacher's suspension and a resulting revocation of the teacher's certificate under ORS 342.650 and 342.655.

The teacher obviously has standing to challenge the state Superintendent's revocation of her teaching certificate, and a demand for a hearing before that official is a logical first step, despite doubts whether the law leaves anything for him to decide. But the school district's stake in the revocation of the teacher's certificate is far from obvious. The district need not request revocation and is not otherwise a necessary party to the revocation proceeding. Again, possible arguments for allowing the district to intervene in the revocation proceeding can be imagined, but none were made here.[4] The record contains no motion to intervene or order allowing intervention. The district simply appeared before the Superintendent's hearing officer without stating any reasons for its appearance and was allowed to participate without objection.

*The Superintendent's responsibility.* What the parties wanted the Superintendent to decide was the constitutional validity of the law forbidding a teacher to wear religious

---

[3] The 1971 statute allows "suspension" only for some of the causes that justify dismissal, and the suspension must be followed within five days by dismissal proceedings or reinstatements. ORS 342.865, 342.875. Violation of ORS 342.650 is not one of the grounds listed in ORS 342.865. The effect of the 1971 statute on ORS 342.655, and the duration of a "suspension" under that section, have not been briefed or discussed by the parties or by the Court of Appeals.

[4] For instance, a district might want to reinstate a teacher who has been "suspended" and therefore object to the statutory revocation of the teacher's certificate that prevents reinstatement, or it might fear civil liability if ORS 342.650, under which it suspended the teacher, were to be invalidated in a revocation proceeding in which the district failed to appear.

dress while on duty. The Superintendent, adopting the hearing officer's memorandum of law, concluded that he had no power to decide the constitutional question. The memorandum stated:

> "Judicial decisions are not completely in accord, but the clear consensus seems to be that in a proceeding such as this the administrative agency has no authority to declare an act of the legislature to be contrary to the federal and state constitutions. That decision is to be made by a court. The Attorney General takes a contrary position."

The memorandum quoted Professor K. C. Davis's distinction between applying a statute constitutionally, which is the agency's duty, and determining the constitutional validity of a statute, which Davis considers to be beyond an agency's power.[5]

Enough judicial opinions have said that agencies cannot pass on the constitutionality of the laws entrusted to them to support the cautious conclusion of the hearing officer's memorandum, at least as to federal agencies; but more recently the proposition has been questioned.[6] It deserves examination.

Agency power to consider constitutional challenges to a statute generally has been discussed in opinions on exhaustion of administrative remedies. The issue has been, not whether an agency erred in considering such a challenge, but whether a litigant could take the challenge to court without first asking the agency to pass upon it. Both the Davis treatise and Jaffe, Judicial Control of Administrative Action 438 (1965), place the question under the "exhaustion" heading.

---

5

"* * * When a tribunal passes upon constitutional applicability, it is carrying out the legislative intent, either express or implied or presumed. When a tribunal passes upon constitutionality of the legislation, the question is whether it shall take action which runs counter to the legislative intent. We commit to administrative agencies the power to determine constitutional applicability, but we do not commit to administrative agencies the power to determine constitutionality of legislation. Only the courts have authority to take action which runs counter to the expressed will of the legislative body." (Footnote omitted.)

3 Davis, Administrative Law Treatise 74, § 20.04 (1958).

[6] *See, e.g.,* Note, *The Authority of Administrative Agencies to Consider the Constitutionality of Statutes,* 90 Harv L Rev 1682 (1977).

This is not such a case. Opinions denying agency power in constitutional cases only as an explanation for dispensing with the normal exhaustion requirement are weak authority for holding that an agency should not consider a constitutional claim when a party chooses to exhaust that process, or that the agency errs if it does decide the issue. If an agency decides a constitutional issue, though needlessly, the only result is that it will be affirmed on judicial review if the decision was right and reversed if the decision was wrong. It would be pointless to reverse an agency for correctly deciding a legal question on the ground that the agency should have waited for the reviewing court to decide the question.

Long familiarity with the institution of judicial review sometimes leads to the misconception that constitutional law is exclusively a matter for the courts. To the contrary, when a court sets aside government action on constitutional grounds, it necessarily holds that legislators or officials attentive to a proper understanding of the constitution would or should have acted differently.[7] Doubt of an

---

[7] Article IV, section 31 of the Oregon Constitution provides:

"The members of the Legislative Assembly shall before they enter on the duties of their respective offices, take and subscribe the following oath or affirmation;—I do solemnly swear (or affirm as the case may be) that I will support the Constitution of the United States, and the Constitution of the State of Oregon, * * *."

Article XV, section 3 of the Oregon Constitution provides:

"Every person elected or appointed to any office under this Constitution, shall, before entering on the duties thereof, take an oath or affirmation to support the Constitution of the United States and of this State, and also an oath of office."

As these provisions show, the constitution does not contemplate that legislators and officials will act as they think best and leave the constitutionality of their acts to the courts. Courts may have the last word in interpreting the constitution, but Chief Justice Marshall's defense of "the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 US (1 Cranch) 137, 177 (1803), did not imply that constitutional law is the province and duty *only* of the judicial department, leaving Congress and executive officials unconstrained to pursue their ends subject only to judicial review. *See* Brest, *The Conscientious Legislator's Guide to Constitutional Interpretation*, 27 Stan L Rev 585 (1975); Mikva & Lundy, *The 91st Congress and the Constitution*, 38 U Chi L Rev 449 (1971); Morgan, Congress and the Constitution 10 (1966). The Superintendent of Public Instruction himself holds a constitutional office, Or Const, Art VIII, § 1, and must satisfy himself that he conducts it in accordance with the constitution.

Our recent decision in *OEA v. Roberts*, 301 Or 228, 721 P2d 833 (1986) involved a somewhat different example of an official's responsibility to apply a constitutional test, because there the Secretary of State was held responsible for applying the

agency's obligation to decide constitutional challenges to its governing statute is itself a question of interpreting the agency's statutory duties. The agency's duty to decide such challenges would not be doubted if the legislature provided for it expressly rather than doing so implicitly under the general term "law" in the Administrative Procedure Act provisions that require a final order in a contested case to include the agency's conclusions of law, ORS 183.470(2), and subject the order to reversal if it violates a constitutional provision, ORS 183.482(8)(b)(C), *see also* ORS 183.484(4)(b)(C).

An agency ordinarily can interpret a statute so as to exclude unconstitutional applications before it is forced to question the statute's validity. An agency also should consider whether anyone can obtain higher executive or judicial review if the agency erroneously concludes that the statute contravenes the constitution. In the present case, as we next discuss, there is no obvious party that could obtain review if the Superintendent held ORS 342.650 or 342.655 unconstitutional.

■ *The parties' standing in the Court of Appeals.* As already noted, the school district's legal interest in the Superintendent's revocation of Cooper's teaching certificate under ORS 342.655 is doubtful. The district maintains, and in the absence of any objection the Court of Appeals could accept, that the district's unopposed appearance before the hearing officer effectively made it an intervening party. *Cf. Marbet v. Portland Gen. Elect.,* 277 Or 447, 561 P2d 154 (1977). But the district's role became even more dubious after the Superintendent ordered revocation of the certificate, when the district filed a petition to review that order in the Court of Appeals, naming Cooper as the respondent and seeking to have the order affirmed. At this point, the Court of Appeals should have dismissed the district's petition for judicial review.

The court quoted ORS 183.480(1), which allows "any party to an agency proceeding" to seek judicial review of a final order in a contested case, and it wrote that the statute "does not require that the petitioning party attack the validity of the order." 76 Or App at 148 n 2. That is an improbable

___

constitutional "single subject rule," Or Const Art IV, § 1(2)(d), not the constitutionality of a statute assigning that duty to her.

reading of the judicial review provisions of the Administrative Procedure Act. It assumes that the legislature entitled a party that won everything it asked from the agency to seek judicial review solely in order to win once more in the Court of Appeals. The court's theory would entitle an agency, as a party to its own proceedings, to seek a judicial imprimatur for its acts when no one has challenged their legality and when the agency neither needs nor seeks a court's aid to enforce them. Such an innovation in judicial review would require a clear legislative directive, if indeed it would remain within the judicial power at all. We find no such clear directive.

Two of the judicial review sections point toward the contrary, conventional assumption. ORS 183.480(1) has provided judicial review separately for any *"person* adversely affected or aggrieved" and for "any *party* to an agency proceeding" (emphasis added) since the section was amended in 1971 to extend judicial review to adversely affected or aggrieved persons who were not "parties" to any proceeding. *See Marbet v. Portland Gen. Elect., supra,* 277 Or at 457; *cf. Jefferson Landfill Comm. v. Marion Co.,* 297 Or 280, 686 P2d 310 (1984). The subsection continues by expressly dispensing with the prerequisite of a petition for reconsideration by the agency. This provision reflects the normal assumption that a petitioner for judicial review finds some fault with the agency's order.

ORS 183.482, prescribing judicial review of orders in contested cases, does not expressly require the petition for review to state the grounds why the order should be reversed or remanded, but ORS 183.484(3) makes this clear with respect to agency orders outside contested cases.[8] That a party wishes an agency to explain its order by different or further reasons, as the school district requested in this case, is not a demand for modification of the order.

---

[8] ORS 183.484(3) provides:

"The petition shall state the nature of the petitioner's interest, the facts showing how the petitioner is adversely affected or aggrieved by the agency order and the ground or grounds upon which the petitioner contends the order should be reversed or remanded. The review shall proceed and be conducted by the court without a jury."

The appellate courts' rules assume that a petitioner objects to the agency's order when they require that the petition "be accompanied by a copy of the order, rule or ruling *from which the appeal is taken.*" ORAP 5.10(4) (Emphasis added.) An "appeal" from an order does not encompass a petition to a court to affirm an order.

The school district requested the Court of Appeals to affirm the Superintendent's order revoking Cooper's teaching certificate. The district's only stated disappointment with the Superintendent's order is that his reasons for it did not expressly declare ORS 342.650 and 342.655 to be constitutional, an issue that he held to be beyond his authority. He did, however, apply the law and revoke the certificate, and the school district's petition for judicial review asked the court to affirm that order without modification. For the reasons we have stated, the Court of Appeals should have dismissed that petition.

■ Fifteen days after the school district's petition, Cooper also petitioned for judicial review of the Superintendent's revocation of her teaching certificate. If Cooper's petition properly brought the order before the Court of Appeals, could the school district appear before the Court of Appeals to defend the order? Again, the record contains no motion or order to allow intervention, and no discussion whether, under ORS 183.482(2), a person may become a party for the first time on judicial review to defend rather than attack an administrative order. In the absence of an objection, however, we see no jurisdictional obstacle that the Court of Appeals had to raise on its own initiative. The district could remain in the case as a respondent to Cooper's attack on the Superintendent's order.

■. Finally, we must consider whether the case became moot on its way to this court. Cooper's petition for judicial review asserted that ORS 342.650, and therefore the revocation of her teaching certificate under ORS 342.655, contravene the guarantees of religious freedom under the state and federal constitutions as well as the provisions of Title VII of the federal Civil Rights Act of 1964, 42 USC § 2000e to 2000e-16 (1981 & Supp 1986). The Court of Appeals noted that subsequently the Superintendent reinstated Cooper's teaching certificate on condition that she not wear religious dress while on duty, and it held that the condition saved Cooper's appeal from being moot.[9] Eventually the court held

---

[9] Again, the record does not show and neither the parties nor the Court of Appeals discuss on what basis the Superintendent believed that he had authority to reinstate a certificate revoked under ORS 342.655 for a violation of ORS 342.650.

The district relies on *Perry v. Oregon Liquor Commission,* 180 Or 495, 499, 177

that revocation of a teaching certificate was an excessive sanction under the First Amendment and reversed the order under review. The Superintendent for the first time became a losing party and as such entitled to seek review in this court of the invalidation of his order and ORS 342.655. So did the school district, once it was accepted as an intervenor in support of the Superintendent's order.

The foregoing procedural problems should have been dealt with below, which might have obviated any need for further review. Despite the dubious status of the parties and proceedings below, however, the holding of the Court of Appeals left the case in a posture in which the Superintendent now is entitled to a decision from this court.

## II.   OREGON'S GUARANTEES OF RELIGIOUS FREEDOM

Cooper's case is not one of declining to comply with an otherwise valid law on grounds of personal religious belief. The law here at issue is not a general regulation, neutral toward religion on its face and in its policy, like the unemployment benefits standards that we sustained against attack under the Oregon Constitution (though not under the First Amendment) by claimants who had been discharged for religiously motivated conduct in *Smith v. Employment Division,* 301 Or 209, 721 P2d 445 (1986), and *Black v. Employment Division,* 301 Or 221, 721 P2d 451 (1986). The cases would be comparable if a school regulation prescribed how teachers should dress while on duty without taking account of religious considerations. Then we would have only an issue of statutory authority to make such a regulation, *see Hysong v. Gallitzin School Dist.,* 164 Pa 629, 30 A 482 (1894); *Neuhaus v. Federico,* 12 Or App 314, 505 P2d 939 (1973), and an individual claim to

---

P2d 406 (1947), for the proposition that a court will decide a moot case "for the guidance of an official administrative agency" in a matter of public welfare that is likely to arise again. More recent decisions have not followed *Perry; see, e.g., Hay v. Dept. of Transportation,* 301 Or 129, 134, 719 P2d 860 (1986); *State ex rel Oregonian Publishing Co. v. Sams,* 298 Or 329, 332, 692 P2d 116 (1984). Legal advice or "guidance" to agencies is the Attorney General's assignment. ORS 180.060(2).

We do not in this opinion pursue Cooper's contention in the Court of Appeals with respect to the compatibility of ORS 342.650 and 342.655 with Title VII, because the conditional reinstatement of her teaching certificate and the narrowing construction that we give to ORS 342.650 substantially change the character of her possible argument under that statute.

exemption on religious grounds. *See, e.g., Goldman v. Weinberger,* 475 US ___, 106 S Ct 1310, 89 L Ed 2d 478 (1986)(military regulation prohibiting headgear indoors applied to Jewish servicemen's yarmulkes); *Menora v. Illinois High School Ass'n,* 683 F2d 1030 (7th Cir 1982)(rule forbidding headwear while playing basketball applied to yarmulkes). But ORS 342.650 is not neutral toward religion. On the contrary, the religious significance of the teacher's dress is the specific target of this law. The law singles out a teacher's religious dress because it is religious and to the extent that its religious significance is apparent when the wearer is engaged in teaching. The issue therefore is whether the law infringes the right guaranteed to "all men"[10] by Article I, section 2, of the Oregon Constitution "to worship Almighty God according to the dictates of their own consciences," or "control[s] the free exercise, and enjoyment of religeous opinions, or interfere[s] with the rights of conscience" contrary to Article I, section 3.

This court sometimes has treated these guarantees and the First Amendment's ban on laws prohibiting the free exercise of religion[11] as "identical in meaning," *City of Portland v. Thornton,* 174 Or 508, 512, 149 P2d 972 (1942); but identity of "meaning" or even of text does not imply that the state's laws will not be tested against the state's own constitutional guarantees before reaching the federal constraints imposed by the Fourteenth Amendment, or that verbal formulas developed by the United States Supreme Court in applying the federal text also govern application of the state's comparable clauses. *See, e.g., State v. Brown,* 301 Or 268, 721 P2d 1357 (1986)(searches and seizures), *State v. Kennedy,* 295 Or 260, 666 P2d 1316 (1983)(double jeopardy); *Hewitt v. SAIF,* 294 Or 33, 653 P2d 970 (1982)(sex discrimination).[12] What is

---

[10] Even the most committed strict constructionist of the constitutional text doubtless would fail the challenge to read "men" to exclude "women," at least unless there were a clear record of such an intention. *See State v. Chase,* 106 Or 263, 271, 211 P 920 (1922)(women became "freemen" and the "peers" of men for jury service upon gaining political rights).

[11] Amendment I to the United States Constitution provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * *."

[12] In determining whether to reach a federal constitutional claim without first disposing of all issues of state law, including the state's constitution, one must distinguish three questions: (1) whether an *issue* has been raised at all; (2) whether any state source has been *cited* in connection with the issue; (3) whether an *argument* has

at issue in a constitutional dispute rarely is what a constitutional text "means" but how to effectuate that meaning in the disputed setting. Judicial formulas or "factors" are not themselves the law but aids to analysis that a court from time to time may employ, rephrase, or replace with a better interpretation of their constitutional source.

The guarantees of religious freedom in Article I provide:

"Section 2. All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences.

"Section 3. No law shall in any case whatever control the free exercise, and enjoyment of religeous (sic) opinions or interfere with the rights of conscience.

"Section 4. No religious test shall be required as a qualification for any office of trust or profit.

"Section 5. No money shall be drawn from the Treasury for the benefit of any religeous, or theological institution, nor shall any money be appropriated for the payment of any religeous services in either house of the Legislative Assembly.

"Section 6. No person shall be rendered incompetent as a

---

been made in support of the state claim.

An issue that is not raised at all, even on a generous reading, presents nothing to be decided (although an appellate opinion may note that the issue was not raised so as to make clear that the case is not a precedent on the question).

If the issue has been raised in general terms, for instance, that a defendant claims a right to "equal protection" or to counsel, or against self-incrimination or double jeopardy, the claim could refer to several statutory or constitutional rules. We have emphasized that parties should specify the statutory or constitutional sources of their claims, *see Sterling v. Cupp,* 290 Or 611, 613 n 1, 625 P2d 123 (1981)(citing cases), but also that a party cannot, by omitting a state-based claim, force an Oregon court to hold that this state "has fallen below a nationwide constitutional standard, when in fact the state's law, when properly invoked, meets or exceeds that standard." *State v. Kennedy,* 295 Or 260, 267, 666 P2d 1316 (1983). When only the disposition of a single case is involved, a court "may request counsel either to explain the claim under the state law or to abandon it," and "if it is abandoned the court can note that fact so that the decision at least will not be a precedent on that issue." *Id.* at 268.

A court, however, is not confined to choosing only among the arguments and authorities cited by counsel for or against a properly identified claim. *See, e.g., State v. Bennett,* 301 Or 299, 721 P2d 1375 (1986)(Jones, J., concurring). Courts can avoid taking parties by surprise by inviting additional memoranda on inadequately briefed questions, as this court frequently does. That course should be followed whenever a litigant asks a court to invalidate a state statute or rule under the federal constitution without briefing its validity, or a possible valid interpretation, under applicable state law. *See, e.g., Planned Parenthood Assn. v. Dept. of Human Res., supra,* note 2.

witness, or juror in consequence of his opinions on matters of religeon; nor be questioned in any Court of Justice touching his religeous belief to affect the weight of his testimony.

"Section 7. The mode of administering an oath, or affirmation shall be such as may be most consistent with, and binding upon the conscience of the person to whom such oath or affirmation may be administered."

This court in fact has interpreted the meaning of these guarantees independently, sometimes with results contrary to those reached by the United States Supreme Court. *See, e.g., Smith v. Employment Division, supra; Salem College & Academy, Inc. v. Employment Division,* 298 Or 471, 695 P2d 25 (1985); *Dickman v. School Dist. 62C,* 232 Or 238, 366 P2d 533 (1961), *cert den* 371 US 823 (1962).

The religion clauses of Oregon's Bill of Rights, Article I, sections 2, 3, 4, 5, 6 and 7, are more than a code. They are specifications of a larger vision of freedom for a diversity of religious beliefs and modes of worship and freedom from state-supported official faiths or modes of worship. The cumulation of guarantees, more numerous and more concrete than the opening clause of the First Amendment, reinforces the significance of the separate guarantees. Article I, section 4, for instance, forbids religious tests specifically "as a qualification for any office of trust or profit"; but in the total context of sections 2, 3, 6 and 7 it would be difficult to argue that the government could impose a religious test on employment in a position that technically is not an "office of trust or profit," for instance in the public schools, on the grounds that such employment is a mere privilege.

Likewise, the present law cannot be sustained simply on grounds that it does not interfere with the free exercise of religion because it regulates conduct rather than religious beliefs or verbal expression of opinion and worship. On that theory, the law could equally ban wearing religious dress while teaching in private schools, or for that matter in public generally, without infringing the free exercise of religion. Such a theory would deny the importance of dress and other external symbols of individual and communal commitment to one's faith that certainly were widely understood to represent (in the literal sense of that word) the practice of one's religion when the constitutional guarantees were adopted. In some

branches of Judaism and Christianity particular modes of dress, although voluntary, may be essential to an adherent's sense of religious identity; in Islamic and other more encompassing religious communities, departure from prescribed dress may mean self-excommunication or lead to actual communal punishment.

■        Thus, a law restricting dress specifically for being "religious dress" cannot stand as a regulation of "conduct" rather than "belief" or "worship." If such a law is to be valid, it must be justified by a determination that religious dress necessarily contravenes the wearer's role or function at the time and place beyond any realistic means of accommodation.

The compatibility of religious dress with the role of public school teachers is an old issue under state laws and constitutions. Generally it involved teaching by nuns while wearing the habits of their orders. It is, of course, a different question whether a constitution itself is claimed to forbid the display of the teacher's religious commitment in the public school or whether a ban on religious dress adopted by law or properly delegated rule contravenes the teacher's religious freedom. In two often cited cases, the Supreme Court of Pennsylvania first held that wearing religious dress did not constitute sectarian teaching, *Hysong v. Gallitzin School Dist.,* *supra;* but after the legislature enacted a law much like ORS 342.650, the court sustained the act. *Commonwealth v. Herr,* 229 Pa 132, 78 A 68 (1910). Similar regulations were sustained in New York, *O'Connor v. Hendrick,* 184 NY 421, 77 NE 612 (1906), and in New Mexico, *Zellers v. Huff,* 55 NM 501, 236 P2d 949 (1951); challenges to tolerating religious dress in the classroom rather than to rules forbidding such dress were rejected in North Dakota, *Gerhardt v. Heid,* 66 ND 444, 267 NW 127 (1936); Indiana, *State ex rel Johnson v. Boyd,* 217 Ind 348, 28 NE2d 256 (1940); Connecticut, *New Haven v. Torrington,* 132 Conn 194, 43 A2d 455 (1945); Kentucky, *Rawlings v. Butler,* 290 SW2d 801 (Ky 1956); and Ohio, *Moore v. Board of Ed.,* 4 Ohio Misc 257, 212 NE2d 833 (1965).

The bare citations do not reveal their historic and embattled settings. In the Indiana case, the school trustees of the City of Vincennes took over parochial school buildings and paid the salaries of Roman Catholic teachers when those schools could not open during the depression year of 1933-34,

confronting the trustees with "an emergency to provide school facilities for more than 800 additional school children" that the court found might well be temporary. *State ex rel Johnson v. Boyd, supra,* 217 Ind at 367. Decisions tolerating nuns' garb in the public schools were superseded by a popular referendum in North Dakota as well as by the legislature in Pennsylvania. Pfeffer, Church, State, and Freedom 413 (1953). Oregon's 1923 predecessor to ORS 342.650 dates from the period of anti-Catholic intolerance that also gave us the initiative measure against private schools struck down in *Pierce v. Society of Sisters,* 268 US 510, 45 S Ct 571, 69 L Ed 1070 (1925).

The courts' tolerance of overt religious symbolism in public schools has differed over time and perhaps with the religious composition of different communities. Looking beyond the specific facts of the cases, however, the decisions generally have been that more than a teacher's religious dress is needed to show a forbidden sectarian influence in the classroom, but that a rule against such religious dress is permissible to avoid the appearance of sectarian influence, favoritism, or official approval in the public school. The policy choice must be made in the first instance by those with lawmaking or delegated authority to make rules for the schools. The courts' role is to see whether the rule stays within that authority and within the constitution and, if necessary, to give the rule a constitutional interpretation.

### III. RELIGIOUS NEUTRALITY IN PUBLIC SCHOOLS

Here the policy choice was made by the legislature. There is no reason to believe that when the Legislative Assembly enacted ORS 342.650 in its present form in 1965, it had any aim other than to maintain the religious neutrality of the public schools, to avoid giving children or their parents the impression that the school, through its teacher, approves and shares the religious commitment of one group and perhaps finds that of others less worthy.

It would be easy to show that this aim has equal constitutional standing with the teacher's religious self-expression if Oregon, like many states, had adopted an explicit constitutional guarantee against sectarian influence in the

public schools.[13] Such a provision was omitted from the education article, Article VIII, of the Oregon Constitution.

Carey's compilation of the proceedings of the constitutional convention shows that the version of present Article VIII of the constitution, as reported on August 26, 1857, by the Committee on Education and School Lands, included a provision that instruction in state colleges and the common schools "shall be free from party or sectarian bias." On September 2, a minority of the committee presented a version that would have forbidden religious standards criteria for schools and teachers in greater detail. Carey, The Oregon Constitution 179, 231 (1926).[14] The source of Oregon's Article VIII, section 3, is reported to have been Article IX, section 3, of the Iowa Constitution of 1846, which contained no such provision, so the point seems to have had independent importance to the anti-sectarian members of the committee. The minority report was rejected by the convention, sitting in committee of the whole, on September 9. On September 12, the committee of the whole voted to strike the final words of the section, including the provision on "sectarian bias," *id.* at 338, and this was done at the third reading of the education article on September 15, when the journal briefly reports:

---

[13] Many state constitutions expressly forbid sectarian influence in the public schools. Characteristic phrases are found in California's Article 9, section 8 ("nor shall any sectarian or denominational doctrine be taught, or instruction thereon be permitted, directly or indirectly, in and of the common schools of this State"); Nevada's Article 11, section 9 ("No sectarian instruction shall be imparted or tolerated" in the public schools); Washington's Article 9, section 4 (Public schools "shall be forever free from sectarian control or influence"). See generally, Antieau, Carroll & Burke, Religion Under the State Constitutions (1965), *Hysong v. Gallitzin School Dist.,* 164 Pa 629, 30 A 482 (1894), *Zellers v. Huff,* 55 NM 501, 236 P2d 949 (1951), *Gerhardt v. Heid,* 66 ND 444, 267 NW 127 (1936), and *Moore v. Board of Ed.,* 4 Ohio Misc 257, 212 NE2d 833 (1965), which involved claims under such constitutional clauses.

[14] The minority report, located in the files of the Oregon Historical Society, would have provided:

"No division of the common school fund, or of any annual apportionment, shall ever be made at the instance of, or for the use and benefit of, any religious sect or persuasion.

"No distinction in the selection of incumbents for office in any department of the common school system, or in the eligibility of instructors, or in the privileges of patrons and pupils shall ever be made on account of religious opinion, provided such religious opinion be not against the police, peace, and dignity of the state.

"No sectarian influence in behalf of or against any religious tenet or persuasion shall be inculcated in any common school in this state."

"On motion of Mr. Kelly, the president was authorized to erase all of the latter part of section 3, line four, after the word schools in said line, in the article on education and school lands."

*Id.* at 354. There is no evidence of any explanation or debate of the deletion, and we have found no reference to it in the contemporaneous press accounts of the convention reprinted in Carey or in any other source. Because the stricken portion also specified that schooling between ages four and twenty-one should be free, the motion possibly focused more on cost than on the nonsectarian provision.

■■ Nonetheless, the aim of maintaining the religious neutrality of the public schools furthers a constitutional obligation beyond an ordinary policy preference of the legislature. It is the obligation stated in Article VIII, section 3, to provide for "a uniform, and general system of Common Schools," which must be done without imposing on the religious freedom under Article I, sections 2 and 3, of the children who attend those schools. It is not necessary to debate how far the ban on fiscal support for religion stated in Article I, section 5, goes beyond narrow financial concerns to imply a larger principle against having government drawn into sponsorship of one or another religion. *See Lowe v. City of Eugene,* 254 Or 518, 547-48, 451 P2d 117, 463 P2d 360 (1970). Government neutrality also serves to protect the "free exercise, and enjoyment of religeous opinions," under Article I, section 3, of those whose opinions differ from what a majority might uncritically accept as the community's "official" religion.

Recognition that freedom of religion for all implies official sponsorship of none has grown with the growing diversity of the nation itself. Two hundred years ago religious toleration could mean toleration merely among Protestant denominations. *See, e.g.,* Massachusetts Declaration of Rights, Art III (1780).[15] Even after Catholics, Jews, other minority faiths, and nonbelievers were accorded the right to

---

[15] At the time of Oregon's constitutional convention, United States Supreme Court Justice Story still could write that the purpose of the First Amendment was "not to countenance, much less to advance Mahometanism, or Judaism, or infidelity, by prostrating Christianity; but to exclude all rivalry among Christian sects." 2 J. Story, Commentaries on the Constitution of the United States 594, § 1877 (1851).

follow their own views, toleration did not imply that their views were as good as the community's dominant religion. For those to whom religion is a matter of truth or error rather than "opinion," as the constitution says, to tolerate error did not mean that those in a position to speak for the community should not officially proclaim what they firmly believe to be the truth. Those whose faiths thereby would be relegated to second-class status of course might see freedom of religion differently.

The main battleground has been the public schools, as the cases under the constitutional proscriptions of "sectarian influence" and later under the First Amendment show.[16] Parents and lawmakers may and do assume that the hours, days, and years spent in school are the time and the place when a young person is most impressionable by the expressed and implicit orthodoxies of the adult community and most sensitive to being perceived as different from the majority of his or her peers; famous constitutional cases have involved this socializing rather than intellectual function of the schools.[17] In excluding teachers whose dress is a constant and inescapable visual reminder of their religious commitment, laws like ORS 342.650 respect and contribute to the child's right to the free exercise and enjoyment of its religious opinions or heritage, untroubled by being out of step with those of the teacher.

The principle is most obvious when the teacher represents the community's dominant religion, but it cannot be limited to that situation. From the "Know-Nothing" nativism of the mid-19th century, through the battle over the

---

[16] *Abington School Dist. v. Schempp,* 374 US 203, 83 S Ct 1560, 10 L Ed 2d 844 (1963); *Engel v. Vitale,* 370 US 421, 82 S Ct 1261, 8 L Ed 2d 601 (1962); *McCollum v. Bd. of Ed.,* 333 US 203, 68 S Ct 461, 92 L Ed 649 (1948).

[17] *See Wisconsin v. Yoder,* 406 US 205, 92 S Ct 1526, 32 L Ed 2d 15 (1972)(compulsory high school attendance); *West Virginia Bd. of Ed. v. Barnette,* 319 US 624, 63 S Ct 1178, 87 L Ed 1628 (1943)(flag salute), *overruling Minersville School District v. Gobitis,* 310 US 586, 60 S Ct 1010, 84 L Ed 1375 (1940); *cf.* Chief Justice Burger's plurality opinion in *Tilton v. Richardson,* 403 US 672, 686, 91 S Ct 2091, 29 L Ed 2d 790 (1971), distinguishing between government aid to church-related schools and colleges:

"* * * There is substance to the contention that college students are less impressionable and less susceptible to religious indoctrination." (Footnote omitted.)

"Blaine Amendment,"[18] to recent times, contention centered on the role of Catholicism in public schools, symbolized by the dress of priests and nuns, as distinct from mainstream Protestantism, represented by school prayers and the King James translation of the Bible. *See* Pfeffer, *supra,* 374-82. It may be a far cry from these historic conflicts to perceive any threat of sectarian influence in the dress of a sect that, in this country, may seem an exotic curiosity. But we are examining the validity of the law against a charge that it denies teachers the freedom to adopt the dress of their respective religions. Neither their religious freedom nor that of their students can depend on calculations which faiths are more likely than others to snatch a young soul from a rival creed. The tides of immigration and of homegrown religions have changed before and are changing again, and what is exotic today may tomorrow gain many thousands of adherents and potential majority status in some communities.[19]

In other contexts we have held that expression that could not constitutionally be prohibited outright may nevertheless be found incompatible with the performance of an official professional role. In *Burt v. Blumenauer,* 299 Or 55, 74, 699 P2d 168 (1985), we recognized that public advocacy of a vote for or against a disputed ballot measure, normally the essence of individual free speech, may under narrowly defined

---

[18] The "Blaine Amendment" embodied a proposal by President Grant in 1875, quoted in *McCollum v. Board of Education, supra,* 333 US at 218 (Frankfurter, J., concurring). Introduced in Congress by Rep. James G. Blaine, it would have provided:

" 'No State shall make any law respecting an establishment of religion or prohibiting the free exercise thereof; and no money raised by taxation in any State for the support of public schools, or derived from any public fund therefor, nor any public lands devoted thereto, shall ever be under the control of any religious sect or denomination nor shall any money so raised or lands so devoted be divided between religious sects or denominations.' "

Pfeffer, Church, State & Freedom 131 (1953). Passed by the House of Representatives, the proposal failed to get the necessary two-thirds majority in the Senate. *Id.* at 131.

[19] From 1900 to 1980 Roman Catholics increased from 17 percent to 30 percent of the population while Protestants declined from 65 percent to about 41 percent. The approximate numbers of Buddhists in the United States increased from 30,000 to 180,000, Muslims from 10,000 to about 1,600,000, Hindus from 1,000 to about 400,000. World Christian Encyclopedia 711 (D. B. Barrett ed 1982). Among specifically American denominations that have evolved since Oregon became a state, Mormon church membership grew from a few thousand in 1840 to about 200,000 in 1900 and 1,500,000 in 1960. Christian Science churches and societies, which did not exist before 1879, numbered about 2,300 in 1960. Gaustad, Historical Atlas of Religion in America 87, 132 (1962).

circumstances be incompatible with an individual's public duties. *In re Lasswell,* 296 Or 121, 673 P2d 855 (1983), held that a disciplinary rule prohibiting a prosecutor's extrajudicial comments on a pending trial is not an unconstitutional infringement of free speech if it is narrowly limited to actual incompatibility between the speech and the prosecutor's official function.[20] Interestingly enough, the issue of religious dress has arisen in trial courtrooms as well as in classrooms when a Catholic priest who was a member of the bar asserted the right to appear in his religious garb. *See La Rocca v. Lane,* 37 NY2d 575, 376 NYS2d 93, 338 NE2d 606 (1975), *cert den* 424 US 968 (1976); *People v. Rodriguez,* 101 Misc 2d 536, 424 NYS2d 600 (1979); *Gold v. McShane,* 74 App Div 2d 860, 426 NYS2d 504 (1980), in which the New York courts apparently left the issue to the discretion of individual trial courts.

We conclude that ORS 342.650 does not impose an impermissible requirement for teaching in the public schools if it is properly limited to actual incompatibility with the teaching function.

## IV.   THE PERMISSIBLE REACH OF ORS 342.650

■     A court's obligation before invalidating a textually overbroad statute is to see whether it can be interpreted so as to save the legislative purpose as far as the constitution permits, leaving only marginal instances of potentially unconstitutional application to case-by-case decision. *State v. Moyle,* 299 Or 691, 702, 705 P2d 740 (1985). The Court of

---

[20]

"The point of the disciplinary rule, therefore, is not restraint of free expresson by lawyers because they are lawyers. That could not survive the constitutional principles we reviewed in *In re Richmond,* 285 Or 469, 474-75, 591 P2d 728 (1979). Rather, the rule addresses the incompatibility between a prosecutor's official function, including his responsibility to preserve the conditions for a fair trial, and speech that, though privileged against other than professional sanctions, vitiates the proper performance of that function under the circumstances of the specific case. In short, a lawyer is not denied freedom to speak, write, or publish; but when one exercises official responsibility for conducting a prosecution according to constitutional standards, one also undertakes the professional responsibility to protect those standards in what he or she says or writes. We conclude that DR 7-107(B) survives the accused's constitutional challenge if it is narrowly interpreted so as to limit its coverage, in the words of article I, section 8, to a prosecutor's 'abuse' of the right 'to speak, write, or print freely on any subject whatever.' "

*In re Lasswell,* 296 Or 121, 125, 673 P2d 855 (1983).

Appeals recognized the need to limit the potential reach of ORS 342.650. Compliance with the statute demands some sacrifice of religious self-expression by a teacher. The statute, of course, does not forbid the wearing of religious dress outright, but it does forbid doing so while teaching. The law could be described either as denying a teacher's right to practice her religion or as denying a person demonstratively committed to a religious vocation the opportunity to teach in the public schools. The two descriptions may invite different responses, but the issue should not hinge on semantics.

■ To forbid a teacher to disclose personal views that are identified as such and not attributed to the school, including religious views, involves issues of free speech as well as religion. A program hermetically sealed to exclude all controversy and potentially offensive ideas can hardly be defended as education for the world beyond the classroom. Teachers as well as students have been held free to express their objection to national policy symbolically by their dress.[21] A distinction between privileged personal expression and forbidden "indoctrination" or "proselytizing" is easier to assert than to apply; one teacher's personal views and acts can carry more unintended persuasion than another's most determined teaching efforts. Yet if Janet Cooper on December 6, 1983, only had told her class that she had changed her name because she became a Sikh and what this meant, the school district could hardly have discharged her in order to protect her pupils against religious proselytizing. To disqualify her from teaching under ORS 342.650 for dressing as a Sikh one must find greater significance in the forbidden religious dress than in the verbal religious self-identification.

The Court of Appeals stated this greater significance as follows:

"We therefore construe the term 'religious dress' to mean clothing that is associated with, and symbolic of, religion. To be symbolic, the clothes must communicate the wearer's adherence to a particular religion. We construe 'while in the performance of his duties as a teacher' to include only those

---

[21] *Tinker v. Des Moines Community School Dist.,* 393 US 503, 89 S Ct 733, 21 L Ed 2d 731 (1969); *James v. Board of Education of Central Dist. No. 1,* 461 F2d 566 (2nd Cir), *cert den* 409 US 1042 (1972).

duties which systematically bring the teacher, as a teacher, into contact with students." (Footnote omitted).

76 Or App at 150-51. We agree with this interpretation as far as it goes, but more needs to be added. The quoted paragraph correctly recognizes that "religious dress" must be judged from the perspective both of the wearer and of the observer, that it is dress which is worn by reason of its religious importance to the teacher and also conveys to children of the age, background, and sophistication typical of students in the teacher's class a degree of religious commitment beyond the choice to wear common decorations that a person might draw from a religious heritage, such as a necklace with a small cross or Star of David. A teacher does not violate the statute by wearing a garment or a color that unintentionally happens to imply membership in some religious group, nor, for instance, by dressing in clerical garb to assume a role in a classroom historical exercise or a performance of, say, George Bernard Shaw's *Saint Joan.*

The quoted formulation also recognizes that the "performance of his duties as a teacher" does not include everything that a teacher is paid to do and every hour during which he does it. Under the principles already discussed, the phrase must be confined to those circumstances when a teacher's dressing in accordance with the standards of his or her religion is truly incompatible with the school's commitment to maintaining for its students the atmosphere of religious freedom and neutrality that is the objective of ORS 342.650. This means appearing in religious dress while dealing directly with children in a teaching or counseling role.

The additional element not stated in the opinion of the Court of Appeals is the continual or frequent repetition of a teacher's appearance in specifically religious (not merely ethnic) dress. The religious influence on children while in the public school that laws like ORS 342.650, in their concern with the employment of nuns wearing their special garb as public school teachers, legitimately seek to prevent is not the mere knowledge that a teacher is an adherent of a particular religion. Their concern is that the teacher's appearance in religious garb may leave a conscious or unconscious impression among young people and their parents that the school endorses the particular religious commitment of the person to

whom it has assigned the public role of teacher. This is what makes the otherwise privileged display of a teacher's religious commitment by her dress incompatible with the atmosphere of religious neutrality that ORS 342.650 aims to preserve, or so the school authorities may decide. The statute therefore would not be violated whenever a teacher makes an occasional appearance in religious dress, for instance on her way to or from a seasonal ceremony. It is the same distinction as that between an occasional religious meeting, parade or brief display in a public park or building and the permanent erection of a religious symbol, as in *Lowe v. City of Eugene, supra.* Only wearing religious dress as a regular or frequently repeated practice while teaching is grounds for disqualification.

## V. CONCLUSION

We conclude that, when correctly interpreted and applied, ORS 342.650 survives challenge under Oregon's guarantees of religious freedom. As interpreted in this opinion, we believe it also does not violate the federal First Amendment.

■ The Court of Appeals thought that revocation of a teaching certificate was an excessive "sanction" discouraging even privileged exercise of First Amendment rights more than is necessary to achieve the law's purpose of maintaining religious freedom and neutrality in the public schools. We do not disagree with the court's general proposition that First Amendment decisions have required limitations on the exercise of First Amendment rights to be no more restrictive than necessary, although we note, as the district argues, that the decisions deal with the coverage of such limitations rather than with the consequence of violating a valid rule.

ORS 342.650 might indeed restrict a teacher's First Amendment rights to the "free exercise" of religion more than necessary if it were applied literally, but where ORS 342.650 can validly be applied, the revocation of a teaching certificate under ORS 342.655 is not a penalty. It is not a withdrawal of a privilege by reason of hostility to a religious or political belief, as when some states disqualified Communists from driving or practicing pharmacy or from living in public housing. *See Lawson v. Housing Authority of City of Milwaukee,* 270 Wis 269, 70 NW2d 605 (1955); 1 Emerson & Haber, Political and Civil Rights in the United States 547-552 (2d ed 1958). It is a

disqualification from teaching in public schools based on one's doing so in a manner incompatible with that function.[22] We doubt that the First Amendment draws a line between a law that disqualifies a public school teacher by compelling her discharge and another law that disqualifies her by revoking her certificate to teach in the public schools. ORS 342.655 does not forbid requalifying for a certificate.

Insofar as the decision of the Court of Appeals strikes down ORS 342.655 on that premise, it must be reversed. As already noted, on the record in this proceeding the question whether Cooper's conduct would disqualify her is not before us. The determination that a teacher has violated ORS 342.650 is made by the school district. No argument has been presented to us why that determination is reviewable by the Superintendent. Because ORS 342.650 and 342.655 can be interpreted to remain within constitutional limits and can be constitutionally administered, the Superintendent's order pursuant to ORS 342.655 is not unlawful for being based on an invalid statute. ORS 183.482(8)(a). The Superintendent's subsequent conditional reinstatement of Janet Cooper's teaching certificate also is not before us in this proceeding. Whatever hypothetical legal issues might arise should she choose to resume teaching in Oregon will have to await the event; perhaps no one would call her certification to do so into question.

The decision of the Court of Appeals is reversed.

---

[22] We realize that this further narrowing of the statutory coverage does not (and in the posture of this case cannot) relieve teachers and administrators of all doubts about the proper application of the statute by school districts in diverse factual situations. Similar issues arise in other contexts and call for refinement of standards by administrative rules or by reasoned decisions, see *Ross v. Springfield School District*, 300 Or 507, 716 P2d 724 (1986), and we assume that a district will not discharge a teacher under ORS 342.650 without prior warning that her conduct may require it. Of course, it also is possible that the concerned groups will relieve the remaining doubts by pursuing legislative amendment or repeal of the two statutes.