Argued and submitted July 16, 1986, reversed and remanded as to condition 12; otherwise affirmed January 28, 1987

In the Matter of
Mark Tucker, a Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF POLK COUNTY,
*Respondent,*

*v.*

TUCKER et al,
*Appellants.*

(J-3808; CA A37012)

731 P2d 1051

Paul G. Crowley, Salem, argued the cause for appellants. With him on the brief was James J. Susee, Salem.

Robert M. Atkinson, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, James E. Mountain, Jr., Solicitor General, and Nancy L. Simmons, Certified Law Student, Salem.

Before Richardson, Presiding Judge, and Joseph, Chief Judge, and Deits, Judge.

JOSEPH, C. J.

Deits, J., specially concurring.

## JOSEPH, C. J.

Parents appeal in this juvenile case from a dispositional order containing conditions that they must obey in order to regain custody of their child. They are members of the Good Shepherd Tabernacle, a Christian church founded by Ariel Sherman. In April and May, 1984, approximately 50 church members, including parents, moved to Oregon and took possession of a group of residences in Polk County. In November, 1984, as a result of child abuse reports, Children's Services Division (CSD) was granted temporary custody of several children, including Mark Tucker. The children were placed temporarily in foster homes, and CSD petitioned for wardship. After a hearing, CSD was awarded custody of Mark for placement in foster care. The court ordered that his physical custody be returned to parents as soon as practicable, subject to certain conditions.

We address only the assignment of error[1] which contends that condition 12 in the dispositional order violates parents' constitutional right to the free exercise of religion under the Oregon and United States Constitutions. The condition provides:

"The parents and the said child shall have no contact with Mr. Ariel Sherman whatsoever. The word 'contact' is defined to mean any contact or communication, either direct or indirect, in person, by telephone, by writing or otherwise, by himself or herself or others acting on his or her behalf."

Testimony at the hearing established that Mark's parents and Sherman had disciplined him by various cruel methods. ORS 419.476(1)(e). There were three types of punishment: being required to sit for long periods in an empty outdoor swimming pool; being handcuffed to pipes in the pool's pumphouse; and being placed in a storage room, known as the "dark room." Mark said he had been placed in the pool with other children from 8 a.m. to 9 p.m. for two consecutive summer days. The children were not allowed out of the pool to use the toilet. They had to urinate and defecate in their clothes and, when they were taken out of the pool, their clothes were removed and they were hosed down. Mark also testified that Sherman determined what type of punishment

---

[1] Parents' other assignments of error require no discussion.

the children would receive and that, after the pool ceased to be effective as a punishment place, Sherman began placing the children in the storage room. Mark was tied up in the room by Sherman and left to hang from the ceiling for most of one day.

O'Connell, a member of the commune whose children had also been taken away by CSD, confirmed Mark's testimony about the various forms of punishment. He also stated:

"Most of us in the group looked to Mr. Sherman for guidance and for counselling. And I guess I have to say for the most part preferred to relinquish our own responsibility where our children were concerned and preferred to allow him to see what he could do with them when we felt inadequate or ineffectual or unable to do something with them."

The court found Mark's and O'Connell's testimony wholly credible. Anderson, also a member of the commune from November, 1979, to May, 1984, testified that Sherman had "total control over every single aspect" of the commune, including punishment of children. He described frequent evening meetings at which discipline problems with the children were discussed and at which Sherman would prescribe a "correction." Once Sherman had prescribed a procedure to correct a problem, all members were expected to follow it. Testimony also established that Sherman played the controlling role in the religious beliefs of the members of the Good Shepherd Tabernacle. He is considered by the members to be a pastor, an overseer and a counselor.

We first address the state constitutional claim. *See Smith v. Employment Div.,* 301 Or 209, 213, 721 P2d 445 (1986). Article I, sections 2 and 3, of the Oregon Constitution provide:

"(2)   All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences.-

"(3)   No law shall in any case whatever control the free exercise, and enjoyment of religeous [sic] opinions, or interfere with the rights of conscience.-"

For a court to impose a total ban on any form of contact between a person and the person's pastor impinges on that person's right to the free exercise and enjoyment of religious opinions. Although a judge may impose conditions

necessary for a child's welfare before permitting reestablishment of parental custody, when the conditions also affect the parents' constitutional rights, they must be strictly tailored to do no more than what is necessary for the child's welfare. Parents may not be required to choose between their religious beliefs and practices and their children when there is no compelling reason for forcing them to the choice. *Carroll v. Princess Anne,* 393 US 175, 183, 89 S Ct 347, 21 L Ed 2d 325 (1968); *Braunfeld v. Brown,* 366 US 599, 607, 81 S Ct 1144, 6 L Ed 2d 563 (1961); *Shelton v. Tucker,* 364 US 479, 488, 81 S Ct 247, 5 L Ed 2d 231 (1960). Those federal decisions accord with the proper interpretation of the Oregon Constitution. *See Cooper v. Eugene Sch. Dist. No. 4J,* 301 Or 358, 723 P2d 298 (1986); *Christofferson v. Church of Scientology,* 57 Or App 203, 644 P2d 577, *rev den* 293 Or 456 (1982), *cert den* 459 US 1206, 1227 (1983).

■ Parents assert that the challenged condition is not the least restrictive means available to protect Mark. They suggest the existence of many less restrictive alternatives which, they claim, would be sufficient to protect the child and would be less burdensome on their exercise of their religion. One would restrict contacts between Sherman and the parents and their child to those which would pertain solely to their religious beliefs and practices. We cannot accept that alternative, because the record compels the conclusion that the parents' religious beliefs and practices, as directed by Sherman, formed the basis for disciplining Mark. Parents also suggest that the court could have ordered, simply, that Sherman play no role in the disciplining of Mark. That might be appropriate, and it might not affect parents' contact with Sherman on religious matters that would not endanger the child. Given the importance of the issue, the possibility of further developments since the date of the order and the necessity for a carefully crafted order arrived at between the court, parents and CSD, we remand for a determination of the least restrictive limitations that are now necessary and feasible to protect the child and for any other appropriate action. In view of our disposition, the federal constitutional claims lead to the same result.

Reversed and remanded as to condition 12; otherwise affirmed.

.

**DEITS, J.,** specially concurring.

I write separately to highlight several of my concerns. It is clear that the state has a strong interest in protecting the physical and psychological health and welfare of the child, Mark Tucker. The state has the right, indeed the responsibility, to return physical custody of Mark to his parents only upon fulfillment of conditions crafted to ensure that further abuses will not occur. These conditions, however, may not overly impinge upon parents' right freely to participate in and exercise the religion of their choice. It is our responsibility to balance these interests carefully, which unfortunately have come into conflict, based upon the circumstances presented by this case. The words of Oliver Ellsworth, a member of the Constitutional Convention and later Chief Justice of the United States, are apt:

> "But while I assert the rights of religious liberty, I would not deny that the civil power has a right, in some cases to interfere in matters of religion. It has a right to prohibit and punish gross immoralities and impieties; because the open practice of these is of evil example and detriment." *Quoted in Braunfeld v. Brown,* 366 US 599, 600, 81 S Ct 1144, 6 L Ed 231 (1960).

At this juncture, I agree with the majority that, although condition 12 is crafted to protect Mark, it overly impinges upon parents' constitutional rights to exercise their religion and that less restrictive means are available. I believe that, on remand, the court must draft a substitute condition which will prevent Sherman from in any way determining or implementing the disciplining of the child. It may well be advisable to require parents to move out of the church compound and into separate autonomous housing. It is also crucial that, pursuant to the court's dispositional order, CSD carefully monitor compliance with the court's order after the return of the child and that CSD's monthly reports to the court be regular and detailed. If the continuing investigation reveals any non-compliance with the order or other endangerment to the child's welfare, those changed circumstances might well result in restrictions like those in condition 12 being within the bounds of the Oregon and United States Constitutions.